Julia Ann White INMAN,
Plaintiff/Appellee,

v.

Gordon Everett INMAN,
Defendant/Appellant.

Supreme Court of Tennessee,
at Nashville.

April 22, 1991.

Rehearing Denied July 1, 1991.

Maclin P. Davis, Jr., Nashville, Dave A. Alexander and Ernest W. Williams, Franklin, for plaintiff/appellee.

Edward P. Silva and R.E. Davies, Hartzog, Silva & Davies, Franklin, for defendant/appellant.

## OPINION

O'BRIEN, Justice.

This divorce action was commenced in September, 1987. The final hearing was in November, 1988, terminating a marriage of some 28 years. It has since been litigated vigorously, largely due to a dispute over the distribution of marital property, which both parties contend is not in accordance with T.C.A. § 36-4-121, and the award of alimony and attorneys fees to plaintiff by the Court of Appeals.

The circumstances of the parties prior to the granting of the divorce will be taken from the memorandum of the trial court relating to division of marital property. At the time of the divorce Mr. Inman was 50 years of age and Mrs. Inman was 51. Both were in good health. At the time of the marriage Mr. Inman had an approximate

net worth of $150,000, acquired entirely by his own earnings, savings and investments. His principal assets were a partnership interest in a service station and rental real estate equities. Mrs. Inman owned no significant property at the time of the marriage. During the early years of the marriage she was engaged in keeping house and caring for the four (4) children born to them. Mr. Inman worked approximately 72 hours a week at the service station and continued to buy and sell real estate. Approximately five (5) years after the date of the marriage the combined net worth of the parties had reached about $1,000,000. After the children reached school age Mrs. Inman began showing real estate listed by her husband to prospective buyers. About 1973 she obtained a license as an affiliate real estate broker. In 1974 or 1975 the two of them became associated with the same real estate broker, although Mr. Inman was still working long hours at the service station and Mrs. Inman was primarily engaged as a homemaker. In 1976 the parties purchased Magnolia Hall, a large, older home, in Franklin, Tennessee, where they resided together until September, 1987, when Mr. Inman removed himself from the residence. In 1977 Mr. Inman sold his interest in the service station and became a full time investor, promoter and commission salesman in the real estate field. In 1979 he established a real estate agency under the name, Inman Realtors. This venture, beginning with Mr. and Mrs. Inman and one affiliate broker, achieved considerable success and at the time of the divorce employed more than 40 affiliate brokers. Mrs. Inman was paid a substantial salary as a salesperson for Inman Realtors. It appeared that she was a capable and productive salesperson although she did not attend sales meetings and tours normally required of affiliate brokers. She did not appear to the other affiliate brokers in the agency to be acting as a full-time sales agent. Her contention that she and Mr. Inman were co-managers of Inman Realtors was not supported by the evidence. After founding Inman Realtors Mr. Inman participated in a joint venture in an enterprise managing and dealing in Nutri/System franchises. This business was extremely successful and substantially increased the combined net worth of the parties.

After setting aside their separately owned property the trial judge found their combined net worth to be approximately $9,000,000. He deducted the sum of $1,000,000 in consideration of the accrual to Mr. Inman's initial contribution of $150,000 and fixed the value of the estate subject to equitable division to be approximately $8,000,000. He allotted Mrs. Inman the sum of $2,300,200 in real property, cash and negotiable securities, which included Magnolia Hall. (Mrs. Inman had elected to keep Magnolia Hall, which was valued at $1,400,000, as part of her distribution of marital property, instead of taking the option of receiving its value in cash.) Mr. Inman retained all other assets with the sole responsibility for all debts and liabilities incurred by either of the parties prior to 15 November 1988. The indebtedness totalled nearly $1.3 million dollars. The judge further held that, in view of the amount of money and property received by Mrs. Inman under the decree, together with her substantial earning capacity, it was neither necessary nor appropriate to award her either alimony or attorneys fees. He found that Mrs. Inman was guilty of cruel and inhuman treatment which caused the disintegration of the marriage and the separation of the parties and that Mr. Inman should be awarded an absolute divorce on his counterclaim. The decree of divorce provided for joint custody of the one remaining minor child of the parties, for $1,000 per month child support in the event the child elected to reside with her mother, as well as other provisions for her support and maintenance; and for the division of property as set out heretofore.

In her initial appeal from the trial court's judgment Mrs. Inman raised seven (7) issues for consideration each of which was considered by the Court of Appeals. These issues included (1) denial of a motion for the chancellor to recuse himself; (2) the trial court's failure to hold that defendant's admitted perjury barred him from obtain-

ing a divorce; (3) error in granting the divorce to Mr. Inman on the grounds of cruel and inhuman treatment; (4) error in not awarding the wife a divorce on the grounds of adultery; (5) error in setting aside to Mr. Inman the sum of $1,000,000 as the current value of his $150,000 pre-marital property; (6) objection to the trial court's distribution of the marital property; and (7) the denial of alimony and attorney fees.

The Court of Appeals found that the original suit was filed by the wife against the husband on the grounds of irreconcilable differences and cruel and inhuman treatment.[1] It further found that the husband had filed a counter-complaint seeking a divorce on the ground of cruel and inhuman treatment. Subsequently the wife amended her complaint to allege adultery on the part of the husband as an additional ground for divorce. At the time of the divorce the parties had been married for over 28 years.[2] For the twelve years or so after the marriage in 1960 Mrs. Inman devoted her time to being a homemaker and raising the parties four (4) children. Mr. Inman worked long hours, six or seven days a week at his service station. In 1975 they both obtained real estate licenses and were employed by a local realtor. Mr. Inman continued to work part-time at his service station. Mrs. Inman usually showed the properties while he handled the contract negotiations and closings. In 1979 the parties opened a real estate business known as "Inman Realtors" in Franklin. They employed Mr. Inman's brother and one other employee. The real estate business was capitalized at $10,000, with funds from the parties joint account. In the early years the wife ran the realty office and continued to show the properties while the husband managed the negotiations and closings. The Inman real estate business prospered. In 1980 Mr. Inman became a partner in a Nutri/System franchise. During the years that followed he became more involved in Nutri/System franchises throughout the country, finding it to be a highly profitable business which, by 1986 was the largest single franchisee of Nutri/Systems in America. Mrs. Inman was not involved as a partner or employee in the Nutri/System business. As a practical matter, the parties separated on Easter Sunday, 1987, after a disagreement over church attendance. Following this disagreement the husband withdrew from the marriage and in August of that year moved from the marital bedroom to a separate room in their residence. He advised Mrs. Inman that he wanted a divorce. She filed her complaint for divorce the following month. Mr. Inman then removed from the residence and subsequently filed a counter-complaint. There was an attempted reconciliation which was unsuccessful. Mrs. Inman filed a response to the counter-complaint denying she was guilty of cruel and inhuman treatment. Subsequently in November, 1988 she filed an amended complaint alleging acts of adultery on the part of Mr. Inman with a woman who was at that time also involved in divorce proceedings. In his response to the amended complaint Mr. Inman admitted being in the company of the woman in question on three separate occasions, in Knoxville, Atlanta, Georgia and Dallas, Texas, but denied committing adultery.

The Court of Appeals concluded that the division of marital assets by the chancellor was inequitable and constituted an abuse of discretion. It took away $850,000 of the separate property set aside by the chancellor to the husband and added to the wife's share from the gross estate an additional $1,043,230 in cash, securities and real property. In awarding alimony the appeals court announced its certainty that the chancellor was to some degree influenced by the fact that he had awarded the divorce to the husband and dismissed the wife's complaint for divorce. In light of that fact they found the circumstances to have changed considerably. They reversed the chancellor's decree dismissing Mrs. In-

---

1. The complaint also alleged indignities to her person sufficient to render her condition intolerable, and thereby force her to withdraw.

2. The complaint alleged a marriage of over 26 years.

man's complaint and awarded her a divorce on the grounds of adultery.

On the appeal to this Court by the defendant/appellant, Gordon Inman, five issues have been raised. (1) Was the award of alimony and attorneys fees in the Court of Appeals contrary to existing law, punitive, unsupported by the record, and not based upon the factors set forth in T.C.A. § 36–5–101? (2) Did the Court of Appeals err in revising the trial court's distribution of marital property by adding an additional $1,043,230 to the 2.3 million dollars awarded to Mrs. Inman by the trial court? (3) Did the Court of Appeals err in reversing the trial court's judgment that plaintiff, Julia Ann Inman, was guilty of cruel and inhuman treatment due to its decision to dismiss Mr. Inman's counter-claim? (4) Was it a denial of due process, and did the Court of Appeals have jurisdiction, to find that Mr. Inman had committed perjury when the issue had not been presented in the trial court? and (5) Did the Court of Appeals err in its misapplication of the doctrine of unclean hands by finding Mr. Inman guilty of perjury when in fact there was no perjury on his part, his prior wrongful acts were purged, and there was no prejudice to Mrs. Inman?

In an order entered on 31 May 1990 granting a motion for additional time for oral argument this Court, noting the complexity of the case, specifically stated that the Court's Rule 11 grant was based primarily upon the Court of Appeals decision regarding rehabilitative alimony and the award of attorneys fees. In view of that order we propose to limit the court's ruling to those issues, discussing the evidence in the trial court and the additional rulings of the Court of Appeals only to the extent necessary to make that determination.

Our review of the record indicates the likelihood of any reconciliation between these parties to be so remote that it does not warrant a place in this discussion. However, since T.C.A. § 36–4–121 requires that the distribution of marital property is to be made prior to any order for the support and maintenance of one party by the other, without regard to marital fault, it is necessary that we examine the prior distribution to determine whether it was appropriate for the Court of Appeals to order the payment of alimony and attorney fees.

Although the Court of Appeals took exception to the findings of the trial court as to the value of the marital property of the parties, or as it suggested, the dearth of findings, the trial judge did articulate some of his reasoning in the memorandum of the court.

We have reviewed this record and find sufficient evidence to warrant the trial judge's conclusion that Mr. Inman had an approximate net worth of $150,000 at the time of the marriage which had attained a value of $1,000,000 by the time of the divorce. At the time of the marriage he was 22 years of age. He owned a half interest in a service station where he worked long hours, usually seven (7) days a week. He owned a half interest in three (3) parcels of real estate. He placed a value of $150,000 on his properties, which was not disputed in the record. He worked hard at buying and selling real estate and was extremely successful. He made large sums of money in some of his transactions and within approximately five years their combined net worth was in the neighborhood of $1,000,000. By the time the parties purchased Magnolia Hall he was able to pay $325,000 in cash for the property. It is true that in later years Mrs. Inman participated in the real estate business with her husband. However, in the earlier years she was a homemaker and took care of the children. There is also evidence that she had domestic help to assist her during all of those years. There was considerable evidence that she caused a good deal of friction among the personnel in Mr. Inman's real estate business; nonetheless it is apparent she was successful in that activity, having been a member of the Million Dollar Sales Club in 1986. In 1987 she received $96,000 in compensation as an affiliate broker and in 1988 she received $95,000, none of which seems to be accounted for in this record.

The formulae for the distribution of marital property as well as a decree for sup-

port and alimony are found in the statutes, T.C.A. § 36-4-121 and § 36-5-101, respectively. In reference to the distribution of marital property, the Court is to equitably divide, distribute or assign such property between the parties, without regard to marital fault, in proportions as the Court deems just. T.C.A. § 36-4-121(c) provides the table of relevant factors for the Court to consider in making division of marital property. The Court is not limited to those factors but is to be guided by them.

■ We are of the opinion the trial court endeavored to equitably divide the marital property of the parties between them, based on the evidence which we conclude was not as speculative as the Court of Appeals found it to be. Utilizing the factors contained in the statute as a guide we believe that Mrs. Inman contributed considerably to the preservation and appreciation of the marital property as a homemaker and parent. As a result we are disinclined to set aside the additional property awarded to her by the Court of Appeals in the amount of $1,043,230. However, in respect to the real estate conveyed we are of the opinion that Mr. Inman should have the option to retain those properties upon paying to Mrs. Inman their value after the deduction of any mortgaged indebtedness.[3]

■ We come to the alimony awarded by the Court of Appeals. T.C.A. § 36-5-101 provides that the court may make an order and decree for the suitable support and maintenance of either spouse by the other according to the nature of the case and the circumstances of the parties. This statute too provides that the court shall consider all relevant factors, including those listed under subsection (d). Among those enumerated factors are, "(10) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so." The trial court considered, inter alia, the amount of money and property Mrs. Inman received under the decree, together with her substantial earning capaci-

ty, and found it was neither necessary nor appropriate that she have an award of either alimony or attorneys fees. We agree with that conclusion.

Therefore, we affirm the judgment of the trial court as modified by the Court of Appeals, pertaining to the distribution of marital property, awarding Mrs. Inman property in the additional amount of $1,043,230, as further modified by this Court.

We reverse the judgment of the Court of Appeals awarding alimony and attorney fees.

This case is remanded to the Chancery Court for Williamson County for further proceedings not inconsistent with this opinion. The costs on this appeal are taxed equally to plaintiff and the defendant.

DROWOTA, C.J., COOPER and DAUGHTREY, JJ., and CANTRELL, Special Justice, concur.

## ORDER ON PETITION TO REHEAR

Appellee Julia Ann White Inman has filed a petition to rehear in this Court. Upon consideration of same, we are of the opinion that it is not well taken and should accordingly be denied. The costs of this cause shall be taxed to petitioner.

DROWOTA, C.J., COOPER and DAUGHTREY, JJ., and CANTRELL, Special Justice, concur.

---

3. The real property is listed as the Spring Hill Office Bldg., valued at $150,000 and the Alexander Bldg., valued at $385,000, burdened with an encumbrance of $214,000, leaving a net value of $171,000.