IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 21, 2002 Session

## DAWN LARSEN NICELEY v. JAMES JACOB NICELEY, IV

**Appeal from the Chancery Court for Robertson County**
**No. 15531     Carol Catalano, Chancellor**

---

**No. M2001-02182-COA-R3-CV - Filed March 14, 2003**

---

After a sixteen-year marriage and one child, Husband and Wife both filed for divorce. After hearing the evidence, the trial court fashioned a parenting plan which named Husband the primary residential parent during the school year and named Wife the primary residential parent during the summer and most holidays and school breaks; valued and divided the marital property; and awarded Wife attorney's fees as alimony *in solido*. We affirm the parenting plan and the distribution of marital property but reverse the award of attorney's fees because the trial court found Wife was not economically disadvantaged.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part, and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and JAMES L. WEATHERFORD, SR. J., joined.

Phillip Mark Walker, Goodlettsville, Tennessee, for the appellant, Dawn Larsen Niceley.

Christina Brasher, Springfield, Tennessee, for the appellee, James Jacob Niceley, IV.

### OPINION

Jacob Niceley, IV ("Husband") and Dawn Niceley ("Wife") were married on August 16, 1984, in Forsyth, Missouri. During the early years of the marriage, the parties resided in several states, including Illinois. The couple finally settled in Tennessee.

For the first year or two of the marriage, Husband was in school and Wife worked. Wife had a bachelor's degree in Theater and Speech when the couple got married, and approximately five years later, she decided to return to school to obtain a Master's Degree in Theater and Speech. She enrolled in Austin Peay State University while the couple was living in Clarksville, Tennessee. During that time, Husband supported the family, traveling some 80 miles round trip daily into Nashville to work. Wife received her Master's Degree after approximately two (2) years. She then

worked for a time at Austin Peay State University and at various other jobs. In 1993, their child, a son, was born.

That same year, Husband and Wife purchased a fifty (50) acre farm in Greenbrier, Tennessee. Husband, a recording engineer, was making about $19,000 a year at this time and was attempting to establish himself in the music industry and start a business. In 1995, Husband invested in a start-up business, Audio Services, Inc., with $7,000. He is a 20% shareholder of the business. Audio Services, Inc. owns a parcel of real estate on Music Row with a building that houses a music studio. The property was purchased for approximately $600,000. In addition to his ownership in Audio Services, Husband also does free-lance work as a recording engineer using the name "Like to Hear it Music."

After Wife discovered that she could not teach more than three (3) years at the college level without a doctorate, the parties agreed that the Wife should pursue her doctorate. Because there were no universities in Tennessee that offered a doctorate in her field, Husband and Wife agreed that she would obtain a degree in Theater and Speech from Southern Illinois University, which was approximately three and a half hours away from the couple's home by car. Their child was three years of age at the time Wife began her doctoral program in 1996.

The original plan was for the parties to share in the care of their child during Wife's attendance at school in Illinois. They attempted this arrangement in the first year of Wife's doctorate program, when Husband and Wife were to take turns caring for their three year old, each taking care of him one week at a time. This plan fell through when they were unable to keep babysitters for alternate weeks, and the child remained primarily with Husband during the week. Wife spent every weekend and summer at the marital residence in Greenbrier.

During her first summer home from Illinois, Wife worked at a summer theater program at Volunteer State Community College. During the second year of her doctorate program, the child stayed with his father in Greenbrier and attended Belmont Day School. Wife still came home every weekend during this second year. Wife returned home again for the second summer and once again worked at the summer theater program at Volunteer State. When Wife returned to Illinois for her final semester of school, she took their son with her and enrolled him in a private kindergarten. She and the child made the trip home to Greenbrier every weekend. Wife completed her doctoral program in December of 1998, having amassed student loans in the amount of $3,471.61 and $11,072.69. After obtaining her doctorate, Wife became employed as an Assistant Professor of theater and speech at Volunteer State Community College. She continued to work at the summer theater program at Volunteer State. In the fall of 1999, Wife was employed at Middle Tennessee State University. The parties' child rode the bus to school most mornings, and Wife picked him up from a babysitter on her way home from work.

In November of 1999, Husband told Wife that he did not want to be married to her anymore. The parties attended marriage counseling with a licensed clinical social worker from November of 1999 to April of 2000 on a weekly basis, completing 26 sessions of marital counseling.

In July of 2000 Wife filed a complaint for absolute divorce in the Chancery Court for Robertson County. Shortly thereafter, Husband filed a complaint for divorce. The cases were consolidated by agreed order. The trial court also entered an agreed *pendente lite* order which provided for support for Wife and the parties' child. Several months later, Husband attempted to reduce the *pendente lite* support, but the trial court dismissed the motion.

Prior to the trial, Wife filed a proposed parenting plan requesting primary residential time with the child. Husband did not file his proposed parenting plan requesting primary residential time until the end of the second day of trial and only after the trial court requested that Husband do so. At the trial, both parents offered testimony as to their relationship with their child.

At the time of the trial, Wife had applied for a job in Missouri and had completed the first round of interviews. She expressed a desire to move to Missouri if she obtained the job, because her salary would increase by $5,000 to $10,000 a year. Wife was employed at Volunteer State Community College at that time, earning approximately $32,792 a year plus state retirement and health benefits. Her retirement through her employer was valued at $16,562.52 and her 401k was valued at $800. While Husband's earning history was somewhat erratic, the testimony showed the average of his last three years of income to be $33,250. Husband had a Guardian Mutual Fund valued at $2,970.80 at the time of the hearing and no other retirement benefits of any kind.

Husband owned a 1967 GTO automobile which he purchased prior to the marriage. Wife had Bank of America stock and household furnishings that were given to her prior to the marriage. Husband drove a 1987 Toyota four wheel drive truck and Wife drove a 1988 Volkswagen Cabriolet. The parties accumulated approximately $14,000 in school loans during the marriage to pay for Wife's education. Husband's undergraduate education loans, totaling approximately $10,000, were paid in full during the marriage. There was testimony at the trial as to the profit and loss statements of Audio Services, Inc. Husband testified that the registered S-corporation was operating at a loss and that the investors would be extremely lucky to recoup their initial investment.

The trial court made lengthy findings regarding the distribution of marital assets and child custody. The court found Husband was guilty of inappropriate marital conduct and awarded Wife an absolute divorce. The trial court awarded Husband his Guardian Mutual Fund, valued at $2,970.80 and awarded Wife her retirement accounts valued at $16,565.52 and $801.58 as well as her savings account valued at $1,000. The court distributed the rest of the marital property and awarded each party his or her separate property. The trial court ordered that the marital residence be sold and the proceeds split after paying off the couple's line of credit, the first mortgage, the Wife's student loans, and the judgment against Husband for a portion of Wife's attorney's fees in the amount of $4,630. Husband was not required to pay rehabilitative or *in futuro* alimony to Wife, but was ordered to pay Wife's attorney's fees in the amount of $4,630 for and as alimony *in solido*.

As to child custody, the trial court entered a final parenting plan which granted primary residential custody to Husband during the school year and granted visitation to Wife one night every week and every other weekend. During the summer, however, Wife was given primary residential

custody and Husband was given visitation every other weekend. The parenting plan also gave visitation to Wife on the majority of the holidays, including two weeks of Christmas vacation and spring break. The trial court ordered the parties to cooperate in making major decisions regarding the child, determined that neither party should pay the other child support, granted Wife the right to receive the tax deduction for the child, and ordered Wife to maintain insurance on the child and pay any extraordinary medical expenses not covered by insurance. In fashioning the plan, the trial court specifically noted that the child was to spend the majority of residential time with Husband.

After the final order was issued by the trial court, the marital residence was sold. Sometime thereafter, Husband filed a motion to compel due to Wife's refusal to sign the checks held in escrow from the sale of the marital residence. Wife filed a motion to clarify the court's ruling regarding the parenting plan. After a hearing on the motions, the trial court ordered Wife to sign the checks and clarified the parenting plan in a later order which was incorporated into the final decree. The trial court clarified the Parenting Plan by noting that it intended Wife to have the child every Wednesday night only during the school year, that Wife was also to have visitation with the child every prescheduled school free day from 8:00 a.m. to 8:00 p.m., that Husband's summer visitation on the weekends was the same as Wife's weekend visitation during the school year, that each party is encouraged to provide additional visitation times, and that should a parent miss a scheduled visitation time, the other parent should allow them to make up that time at a later date. The trial court also determined that Husband could remove the child from his present school and enroll him in school in Davidson County.

In this appeal, Wife raises two primary issues: (1) residential schedule of the child; and (2) division of marital property. Husband appeals the trial court's award of attorney's fees.

## I. Residential Schedule of Child

This case was decided shortly after the effective date of the new parenting plan legislation, *see* Tenn. Code Ann. § 36-6-401 *et seq.*, and there is no dispute that the legislation applies herein. Under the new parenting plan legislation, any final decree in an action for absolute divorce involving a minor child must incorporate a permanent parenting plan. A parenting plan is defined in Tenn. Code Ann. § 36-6-402(3) as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule, as well as an award of child support consistent with title 36, chapter 5." According to Tenn. Code Ann. § 36-6-404, a permanent parenting plan shall:

> (a)(1) Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for further modifications to the permanent parenting plan;
> (2) Establish the authority and responsibilities of each parent with respect to the child, consistent with the criteria in this part;
> (3) Minimize the child's exposure to harmful parental conflict;

(4) Provide for a process for dispute resolution, before court action, unless precluded or limited by § 36-6-406; . . .

(5) Allocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing. The parties may incorporate an agreement related to the care and growth of the child in these specified areas, or in other areas, into their plan, consistent with the criteria in this part. Regardless of the allocation of decision making in the parenting plan, the parties may agree that either parent may make emergency decisions affecting the health or safety of the child.

(6) Provide that each parent may make the day-to-day decisions regarding the care of the child while the child is residing with that parent.

(7) Provide that when mutual decision making is designated but cannot be achieved, the parties shall make a good faith effort to resolve the issue through the appropriate dispute resolution process, subject to the exception set forth in subdivision (a)(4)(F) . . . .

Under the legislation, the court is to determine a residential schedule, which designates the primary residential parent and designates in which parent's home the child will reside on given days during the year. Tenn. Code Ann. § 36-6-402(5). A residential schedule is defined as:

. . . the schedule of when the child is in each parent's physical care, and it shall designate the primary residential parent [the parent with whom the child resides more than 50% of the time]; in addition, the residential schedule shall designate in which parent's home each minor child shall reside on given days of the year, including provisions for holidays, birthdays of family members, vacations, and other special occasions, consistent with the criteria of this part; provided, that nothing contained herein shall be construed to modify any provision of § 36-6-108; . . . .

Tenn. Code Ann. § 36-6-402(5). When fashioning the residential schedule, the court is instructed to take into account the factors listed in Tenn. Code Ann. § 36-6-404(b), which states:

. . . the court shall make residential provisions for each child, consistent with the child's developmental level and the family's social and economic circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child. The child's residential schedule shall be consistent with this part. If

the limitations of § 36-6-406 are not dispositive of the child's residential schedule,[1] the court shall consider the following factors:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society which the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education, and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. . . .

---

[1] Tenn. Code Ann. § 36-6-406 instructs a court to limit the residential time for a parent that has engaged in certain specified conduct or exhibits certain traits, including, but not limited to: (1) willful abandonment; (2) physical or sexual abuse; (3) emotional abuse; (4) neglect or nonperformance of parental duties; or (5) an emotional or physical impairment which interferes with parental responsibilities. Neither party herein argues that the trial court should have utilized Tenn. Code Ann. § 36-6-406 to limit residential time with either parent.

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

These factors incorporate those set out in Tenn. Code Ann. § 36-6-106 (the statute which previously guided the trial court in custody determinations) as well as factors established by the courts. The primary concern in determinations of a child's residential placement remains the best interests of the child, and consideration of the factors under Tenn. Code Ann. § 36-6-404(b) still necessitates a comparative analysis.

Thus, by statute as well as case law, the welfare and best interests of the children are the paramount concern in custody and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or her needs. *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999); *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986); *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983). The General Assembly has found that "[t]he best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care." Tenn. Code Ann. § 36-6-401(a). The aim of a custodial or residential arrangement is to promote the child's welfare by creating an environment that promotes a nurturing relationship with each parent. Tenn. Code Ann. § 36-6-404(b); *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996).

Trial courts must exercise broad discretion in child custody matters. *Parker*, 986 S.W.2d at 563. Like a custody decision, a determination of the best residential placement plan for a child must turn on the particular facts of each case. Such decisions often hinge on the trial court's assessment of the demeanor and credibility of the parents and other witnesses. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). The trial court is in a far better position than this court to observe the demeanor of the witnesses and resolve the issues in the case that are based on the credibility of the witnesses. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitacker v. Whitacker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997).

Because of the discretion given trial courts in this area and because of the fact specific nature of such decisions, appellate courts are reluctant to second-guess a trial court's determination regarding custody and visitation. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); *Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997) (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631(Tenn. Ct. App. 1996)). Accordingly, this court will decline to disturb the parenting plan fashioned by the trial court herein unless that decision is based on a material error of law or the evidence preponderates against it. *Adelsperger*, 970 S.W.2d at 485.

Herein, the trial court essentially determined that the Husband would be the primary residential parent during the school year and the Wife would be the primary residential parent during the summer. The child is to reside with Wife for two weeks during Christmas vacation and during spring break. Each parent was given liberal visitation during the time the child was residing with the other parent.

Wife asserts that the plan ordered by the trial court is not in the child's best interests and that the trial court did not consider all of the applicable factors. In its final order, the trial court made extensive findings of fact which recapitulated the testimony at the hearing on a number of issues regarding grounds for divorce, parenting, and property division. It is apparent from the order that the trial court listened attentively to all the evidence, drew factual conclusions, and weighed those conclusions. After studying the trial court's oral findings and final order, we conclude that the trial court considered the relevant factors when fashioning the parenting plan. For example, the trial court recited the history of the parties' child rearing responsibilities, noting that the parties' decision for Wife to pursue an advanced degree and work in the Toby show each summer at Volunteer State, both of which were desired by Wife and encouraged by Husband, resulted in Husband assuming a great deal of responsibility for caring for the parties' child. The trial court found that both parents had an equal opportunity to care for the child and that they were equally fit parents.

Similarly, although Wife argues that the trial court gave undue weight to the parties' work schedules, the court is directed by Tenn. Code Ann. § 36-6-404(b)(15) to consider "each parent's employment schedule" and is authorized to "make accommodations consistent with those schedules." We find no error in the trial court's consideration of the parties' work schedules.

In addition to her argument that the court failed to adequately consider the required factors, Wife essentially disagrees with the trial court's conclusions regarding those factors and the overall decision. We interpret Wife's position as an argument that the evidence preponderates against the trial court's findings. The evidence in this case includes some disputes of fact. It also involves weighing the various facts in designing a residential placement plan that will serve the child's best interests. As discussed earlier, the trial court extensively discussed the evidence herein as well as explaining its application of the facts. Both parties presented testimony and made arguments about the other's failings, sometimes directed to establishing grounds for divorce, but some with relevance to the parenting skills of each. No purpose is served by our recounting the details of those arguments herein. The trial court found both parents were fit, and the evidence does not preponderate against that finding.

We have reviewed the evidence presented in this case, including the testimony from both Husband and Wife, as well as other witnesses, and find that the evidence does not preponderate against the trial court's findings. We find that the trial court fashioned a parenting plan designed to serve the child's best interests.

## II. Division of Marital Property

Wife's complaint with the division of marital property is that the trial court did not value and include in the marital property Husband's share of Audio Services, Inc. and Husband's checking account containing income from his solely owned business, Like To Hear It Music.

Upon the dissolution of a marriage, courts are called upon to divide the assets the parties accumulated during the marriage. Such decisions are very fact-specific, and many circumstances surrounding the property, the parties, and the marriage itself play a role. After classification of the parties' property as either marital or separate, the trial court is charged with equitably dividing, distributing, or assigning the marital property in "proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1). The court is to consider several factors in its distribution. Tenn. Code Ann. § 36-4-121(c) (listing the factors to be considered). The court may consider any other factors necessary in determining the equities between the parties, Tenn. Code Ann. § 36-4-121(c)(11), except that division of the marital property is to be made without regard to marital fault. Tenn. Code Ann. § 36-4-121(a)(1).

The court's distribution of property "is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case." *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). An equitable distribution is not necessarily an equal one. *Word v. Word*, 937 S.W.2d 931, 933 (Tenn. Ct. App. 1996). Thus, a division is not rendered inequitable simply because it is not precisely equal. *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998). Similarly, equity does not require that each party receive a share of every piece of marital property. *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998); *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994).

In the case herein, after hearing extensive testimony, the trial court made specific findings as to the classification and value of property. The court found that the marital home had equity of approximately $94,000. The trial court awarded each party an equal share in the net proceeds from the sale of the home after specified deductions, including Wife's student loans, estimating each share at $39,727.85. The court then totaled the "semi-liquid assets" accrued by the parties during the marriage, namely their retirement accounts, at $20,340.90, and determined that that amount should be divided equally. The court then directed how the total due each party was to be paid, essentially identifying the assets awarded to each to reach the total. Wife was also awarded the bulk of the household furnishings.

The trial court's written order does not refer to either party's checking account and does not mention Husband's interest in Audio Services. With regard to Husband's checking account, Husband argues that the trial court did not abuse its discretion in awarding him the balance of the checking account. Wife argues that the trial court failed to include Husband's checking account, which she maintains includes proceeds from his business as a freelance engineer, and failed to consider it in the distribution of the marital estate.

Wife avers the checking account contained $5,882.14 at the time of the hearing, relying on a bank statement dated March 31, 2000, almost one year prior to the date of the trial on the matter. Husband's testimony at trial was that the balance of the account at the time of trial was approximately five or six hundred dollars and the money in the account had been used primarily to

pay for household expenses during the pendency of the divorce proceedings. We note that Husband had been ordered to pay *pendente lite* support during this time.

Although the practical effect of the trial court's distribution of property may have been to award each party the amounts in his or her own checking account, the order is not explicit in that regard. We find that Husband's testimony regarding the amount remaining in his checking account at the time of the trial was unrefuted. Thus, at most, the trial court failed to include $500 to $600 in the marital estate. We cannot find that an award to Husband of that amount was inequitable.

Although the final order does not specifically mention Husband's interest in Audio Services, the trial court stated the following from the bench:

> I cannot determine what [Husband's] interest in the music studio actually amounts to in dollars and cents. Instead, like I told you already, I averaged his income for the last four years, which included his income from the music studio and from his engineering private employment. And so the Court cannot award [Wife] a portion of any interest that does not appear to exist that has a value. It's more debts and obligations, as it appears, than value. So he keeps his interest in his music studio, his 20 percent interest in this Audio Services doing business as 17 Grand.

We interpret these remarks as including the interest in the marital estate, valuing it at zero, and awarding it to Husband. There is no dispute that Husband's interest in Audio Services is marital property. The disputed issues are the value of that interest and the award to Husband of the entire interest. If the evidence does not preponderate against the trial court's determination that the interest is without positive value, then no real issue is created by its award entirely to Husband.

Husband testified regarding his interest in Audio Services, which was a 20% interest, and about the business itself from its inception. He testified that the business had no positive value and that the "company was struggling to keep the company cash flow going and had been forced to drastically cut back on expenses," including staff and salary. Essentially, Husband's testimony was that his interest, or stock, in the business was worthless and had a negative value. In his testimony, Husband introduced financial statements and profit and loss statements of the company which he had been provided.

Husband testified that the company had been started in 1995 and that since its inception the industry had changed due to the Internet. He stated that the company had "just gone upside down." The company has shown a net loss every year of its existence ranging from $130,000 to $300,000. The company was struggling to keep cash flow going and had cut back staff to one person three days a week. Husband testified that, if liquidated at the time of his testimony, the company would still owe some $300,000 to its creditors. Essentially, Husband testified that his interest in the company has no present liquid value, that no value can be presently realized and may never be realized because of the inability of the company to earn income or show a profit.

-10-

Wife introduced no testimony as to the value of Husband's interest in the business, but relied on cross-examination of Husband. On appeal, she relies on the company's financial statements which reflect the shareholders' equity as company liabilities. She argues that these stock entries represent a true value of Husband's share of the company, which she places at $87,400.

As part of its responsibility to divide the martial estate equitably, the trial court must determine the value of the property included. The value to be placed on an asset is a question of fact. *Kinard*, 986 S.W.2d at 231; *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). Parties and their witnesses often do not agree on the value of specific items in the marital estate, and, in that situation, trial courts may place a value on the property that is within the range of the values presented by the evidence. *Wallace*, 733 S.W.2d at 107. Appellate courts review valuation findings as other findings of fact, and a trial court's determination of value will be presumed to be correct unless the evidence preponderates against it. Tenn. R. App. P. 13(d).

"Determining the value of a closely held corporation is not an exact science," and a number of acceptable methods exist. *Wallace*, 733 S.W.2d at 107. This court has approved, among other methods, that provided by the Internal Revenue Service, which includes consideration of nine factors. *Id.* (citing Rev. Rul. 59-60, 1959-1 C.B. 237). Included among those factors are the nature of the business and its history since its inception, the economic status of the industry, earnings, and dividends and dividend paying capacity. Husband's testimony addresses these factors, and no evidence was introduced to refute his testimony. When asked if the company had a positive balance, Husband replied, "At this point in time, there is no positive balance of the company."

Our review of the evidence leads us to conclude that the trial court's valuation of Husband's interest in Audio Services at zero is within the range of values presented and is supported by the evidence.

The trial court's goal in a divorce case is to divide the marital property in an essentially equitable manner, and equity in such cases is dependent on the facts of each case. The fairness of a particular division of property between two divorcing parties is judged upon its final results. *Watters v. Watters*, 959 S.W.2d 585, 591 (Tenn. Ct. App. 1997). Because dividing a marital estate is a process guided by considering all relevant factors, including those listed in Tenn. Code Ann. § 36-4-121(c), in light of the facts of a particular case, a trial court has a great deal of discretion concerning the manner in which it divides marital property. *Smith v. Smith*, 984 S.W.2d 606, 609 (Tenn. Ct. App. 1997); *Wallace*, 733 S.W.2d at 106. Appellate courts ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c), or is not supported by a preponderance of the evidence. *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996); *Brown*, 913 S.W.2d at 168.

The trial court divided the marital property in an equitable manner. Because we determine that the evidence does not preponderate against the trial court's division of marital property, we affirm the trial court's decision.

III. Attorney's Fees Awarded as Alimony

The trial court ordered Husband to pay Wife's attorney's fees in the amount of $4,630 as alimony *in solido*.[2] Husband avers on appeal that because the trial court specifically found Wife was not economically disadvantaged, she is not entitled to any type of alimony.

Tennessee follows the American Rule requiring "litigants to pay their own attorney's fees in the absence of a statute or contractual provision otherwise." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000); *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998).

Historically, an award of attorney's fees in divorce cases was based on the theory that the wife was entitled to an award of attorney's fees because, where the husband provided the only financial support to the family, the award of attorney's fees in divorce cases allowed the wife access to the court system. According to BENSON TRIMBLE, TENNESSEE DIVORCE AUTHORITIES § 4-8 (1966):

> In Tennessee, attorney fees are treated as part of the expenses incident to the cause of divorce, and are generally allowed to the wife whether she be complainant or defendant in a suit for a divorce. They follow, and are usually adjudicated with, the allowance of alimony and costs to the wife, but are not in themselves the substantive objects of the litigation. *Clements v. Holmes*, 22 Tenn. App. 230, 238, 120 S.W.2d 988; *Sanders v. Sanders*, 40 Tenn. App. 20, 37, 288 S.W.2d 473, 57 A.L.R.2d 932; *Shy v. Shy*, 54 Tenn. 125; *Winslow v. Winslow*, 133 Tenn. 663, 667, 182 S.W. 241.

In 1983, our Supreme Court explained the basis for awarding attorney's fees in divorce cases as follows:

> It was established over a century ago that trial courts have wide discretion in requiring a husband to pay for the reasonable necessities of his wife, including expenses of divorce litigation. The right to an allowance of legal expenses is not absolute. It is conditioned upon a lack of resources to prosecute or defend a suit in good faith. This rule is to enable the wife, when destitute of means of her own, to obtain justice and to prevent its denial. *Thompson v. Thompson*, 40 Tenn. 527, 529

---

[2]Tennessee law recognizes three distinct types of alimony or spousal support. *Self v. Self*, 861 S.W.2d 360, 361-62 (Tenn. 1993). Alimony may be *in solido*, *in futuro*, or rehabilitative. Alimony *in solido* promotes the twin goals of certainty and finality through an award of a fixed amount without conditions. *Waddey v. Waddey*, 6 S.W.3d 230, 232 (Tenn. 1999); *Self*, 861 S.W.2d at 362. That fixed amount may be paid in a single lump sum payment, or it may be paid in periodic installments. *Isbell v. Isbell*, 816 S.W.2d 735, 738 (Tenn. 1991). Alimony *in solido* is not modifiable even upon a showing of changed circumstances, including such events as remarriage or the increased fortunes of the recipient spouse. *Self*, 861 S.W.2d at 362; *Towner v. Towner*, 858 S.W.2d 888, 890 (Tenn. 1993); *Grissom v. Grissom*, 15 S.W.3d 474, 477 (Tenn. Ct. App. 1999). "A typical purpose of such an award would be to adjust the distribution of the parties' marital property." *Burlew v. Burlew*, 40 S.W.3d 465, 471 (Tenn. 2001).

-12-

(1859). If a spouse does not have separate property of her own which is adequate to defray the expenses of suit, certainly she should not be denied access to the courts because she is unable to procure counsel.

*Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983).[3]

In more recent years, it has become well settled that an award of attorney's fees in divorce cases is considered alimony or spousal support, generally characterized as alimony *in solido*. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001); *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001); *Sanella v. Sanella*, 993 S.W.2d 73, 76 (Tenn. Ct. App. 1999), *overruled on other grounds by Bogan v. Bogan*, 60 S.W.3d 721 (Tenn. 2001); *Kinard*, 986 S.W.2d at 235-36; *Smith*, 984 S.W.2d at 610; *Long v. Long*, 957 S.W.2d 825, 829 (Tenn. Ct. App. 1997); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996); *Smith v. Smith*, 912 S.W.2d 155, 161 (Tenn. Ct. App. 1995); *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992); *Cranford v. Cranford*, 772 S.W.2d 48, 52 (Tenn. Ct. App. 1989), *overruled on other grounds by Bogan*, 60 S.W.3d at 730; *Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988). Like other spousal support, an award of attorney's fees is available to either spouse.

Alimony or spousal support is authorized by statute, and a number of cases cite as the basis for attorney's fees as an award of alimony Tenn. Code Ann. § 36-5-101(a)(1), which authorizes courts to order "suitable support and maintenance of either spouse by the other spouse . . . according to the nature of the case and the circumstances of the parties. . . ." *See, e.g.*, *Mitts v. Mitts*, 39 S.W.3d 142, 147 (Tenn. Ct. App. 2000); *Smith*, 912 S.W.2d at 160-61; *Gilliam*, 776 S.W.2d at 86. *See also* JANET L. RICHARDS, RICHARDS ON TENNESSEE FAMILY LAW § 14-3(a)(2) (1997). Thus, the American Rule is satisfied by statutory authority for the award of support upon divorce.

Because attorney's fees are considered alimony or spousal support, an award of such fees is subject to the same factors that must be considered in the award of any other type of alimony. *Yount*, 91 S.W.3d at 783; *Lindsey v. Lindsey*, 976 S.W.2d 175, 181 (Tenn. Ct. App. 1997). Therefore, the statutory factors listed in Tenn. Code Ann. § 36-5-101(d)(1) are to be considered in a determination of whether to award attorney's fees. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 751 (Tenn. 2000); *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995).

There are no hard and fast rules for spousal support decisions, and such determinations require a "careful balancing" of the relevant factors. *Anderton v. Anderton*, 988 S.W.2d 675, 682-83 (Tenn. Ct. App. 1998). Initial decisions regarding the entitlement to spousal support, as well as the amount and duration of spousal support, hinge on the unique facts of each case and require a careful balancing of all relevant factors. *Robertson v. Robertson*, 76 S.W.3d 337, 338 (Tenn. 2002); *Watters*

---

[3]The concern that a spouse without financial means should not be denied access to the courts continues to be addressed by the statutory provision for *pendente lite* support, including sums necessary "to enable such spouse to prosecute or defend the suit" found in Tenn. Code Ann. § 36-5-101(i).

*v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999). Among these factors, the two considered to be the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson*, 76 S.W.3d at 342; *Bogan*, 60 S.W.3d at 730; *Manis v. Manis*, 49 S.W.3d 295, 304 (Tenn. Ct. App. 2001). Of these two factors, the disadvantaged spouse's need is the threshold consideration.

> While there is no absolute formula for determining the amount of alimony, "the real need of the spouse seeking the support is the single most important factor. In addition to the need of the disadvantaged spouse, the courts most often consider the ability of the obligor spouse to provide support."

*Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995) (quoting *Cranford*, 772 S.W.2d at 50).

As with other forms of spousal support, the need of the spouse requesting the award of attorney's fees is the single most important factor. *Miller*, 81 S.W.3d at 775; *Watters*, 22 S.W.3d at 821. The obligor spouse's ability to pay is also an important consideration. *Miller*, 81 S.W.3d at 775; *Hazard v. Hazard*, 833 S.W.2d 911, 917 (Tenn. Ct. App. 1991). Courts have held that in determining whether to award attorney's fees as spousal support, the most important factors are the real need of the disadvantaged spouse, a demonstrated financial inability to obtain counsel, and the ability of the obligor spouse to pay. *Wilder*, 66 S.W.3d at 895; *Cranford*, 772 S.W.2d at 50. In a recent opinion, the Supreme Court reaffirmed the holding in *Fox* that an award of attorney's fees "is conditioned upon a lack of resources to prosecute or defend a suit in good faith . . ." and that such an award is to ensure access to the courts. *Langschmidt*, 81 S.W.3d at 751 (quoting *Fox*, 657 S.W.2d at 749).

Consequently, a spouse with adequate property and income is not entitled to an award of additional alimony to compensate for attorney's fees and expenses. *Lindsey*, 976 S.W.2d at 181; *Duncan v. Duncan*, 686 S.W.2d 568, 573 (Tenn. Ct. App. 1984). If a party has adequate property and income, or is awarded adequate property from the divorce, from which to pay their own expenses, an award of attorney's fees may not be appropriate, after consideration of all relevant factors. *Wilder*, 66 S.W.3d at 895; *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000); *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997); *Houghland v. Houghland*, 844 S.W.2d 619, 623-24 (Tenn. Ct. App. 1992); *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986). The award of attorney's fees as additional alimony is most appropriate where the divorce does not provide the obligee spouse with a source of funds, such as from property division, with which to pay his or her attorney's fees. *Yount*, 91 S.W.3d at 783. Additionally, if a spouse receives alimony as a result of the divorce and will be forced to deplete those funds, designed to sustain that spouse, just in order to pay attorney's fees, an award of attorney's fees is appropriate. *Batson*, 769 S.W.2d at 862. Thus, the primary focus is on whether the requesting spouse has the ability to pay his or her own fees; and, if not, whether the other spouse has the resources to do so. *Houghland*, 844 S.W.2d at 623.

Because support decisions are factually driven and involve considering and balancing numerous factors, appellate courts give wide latitude to the trial court's discretion. *Miller*, 81 S.W.3d at 774; *Cranford*, 772 S.W.2d at 50. Trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount and duration. *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001). Appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to public policies reflected in the applicable statutes. *Bogan*, 60 S.W.3d at 733; *Kinard*, 986 S.W.2d at 234-35; *Brown*, 913 S.W.2d at 169. Our role is to determine whether the award reflects a proper application of the relevant legal principles and that it is not clearly unreasonable. *Bogan*, 60 S.W.3d at 733. When the trial court has set forth its factual findings in the record, we will presume the correctness of those findings so long as the evidence does not preponderate against them. Tenn. R. App. P. 13(d); *Bogan*, 60 S.W.3d at 733; *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

An award of attorney's fees as alimony, like an award of other support, is considered to be within the sound discretion of the trial court. *Loyd v. Loyd*, 860 S.W.2d 409, 413 (Tenn. Ct. App. 1993); *Wallace*, 733 S.W.2d at 110-11. Consequently, such an award will not be reversed on appeal if that discretion is not abused. *Yount*, 91 S.W.3d at 783; *Garfinkle v. Garfinkle*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996); *Lyon v. Lyon*, 765 S.W.2d 759, 762-63 (Tenn. Ct. App. 1988). Although other standards of review have been expressed in some cases, the Tennessee Supreme Court has made it clear that "[t]he allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion." *Aaron*, 909 S.W.2d at 411 (citing S*torey*, 835 S.W.2d at 597 and *Crouch v. Crouch*, 53 Tenn. App. 594, 606, 385 S.W.2d 288, 293 (Tenn. Ct. App. 1964)).

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

In the case herein, the trial court examined Wife's statement of income and expenses and determined that Wife's salary was sufficient to meet her needs. The court also found that the parties' incomes were roughly equal. The court then specifically found that Wife was not economically disadvantaged compared to Husband and declined to award Wife any alimony.[4] The trial court's findings continued:

---

[4]Wife had requested rehabilitative alimony, and the court's order specifically denies "any rehabilitative alimony."

The Court does find, however, that it is [Husband's] dissatisfaction with [Wife's] absence, although he encouraged it; it's [Husband's] dissatisfaction with [Wife] leaving him with so many responsibilities for their home and their child, although he encouraged that; it's those things that caused him to withdraw from the marriage and make [Wife] feel like she should be leaving notes in a peach tree for somebody to care for her and file for this divorce. Therefore, the Court orders that [Husband] pay on her attorney's fees $4,630 as alimony in solido.

Among the statutory factors contained in Tenn. Code Ann. § 36-5-101(d)(1) which a court should consider in deciding whether to award alimony and, therefore, whether to award attorney's fees as alimony are: the relative earning capacity, obligations, needs, and financial resources of each party; the relative education and training of each party; the ability and opportunity and necessity of each party to secure such education and training in order to improve such party's earning capacity to a reasonable level; and the separate assets of each party and the marital property awarded each in the divorce. These factors also relate to the threshold question in an alimony award of whether one spouse is economically disadvantaged in relation to the other. Tenn. Code Ann. § 36-5-101(d)(1). Relative economic disadvantage incorporates the principles of need and ability to pay, which are the primary factors in any award of alimony.

The trial court's factual findings regarding the parties' economic parity, considering the past earnings and the earning potential of each, their educational levels, and the property each had after the divorce, is supported by the evidence. We agree with the trial court that Wife has not demonstrated that she is economically disadvantaged or that she has a need for additional income through alimony. These findings support the trial court's denial of rehabilitative alimony, which Wife has not appealed, but they also support a denial of additional alimony as attorney's fees. Wife has not demonstrated that she is unable to pay her attorney's fees out of her income or separate property or the share of marital property awarded to her. Thus, Wife has failed to establish the primary factor necessary to an award of attorney's fees as alimony.

It is clear from the order that the trial court awarded the attorney's fees because of the trial court's findings that it was Husband whose conduct precipitated the divorce. While the evidence could just as easily support a conclusion that the parties were equally responsible for the breakup of their marriage, we cannot say that the evidence preponderates against the trial court's factual finding on this issue. Essentially, the trial court found that Husband was at fault and awarded attorney's fees on the basis of that finding.

The fault of the parties is one of the factors which may be considered in an award of alimony and, consequently, an award of attorney's fees as alimony. Tenn. Code Ann. § 36-5-101(d)(1)(K); *Inman v. Inman*, 811 S.W.2d 870, 874 (Tenn. 1991); *Yount*, 91 S.W.3d at 783; *Robertson v. Robertson*, No. 03A01-9711-CV-00511, 1998 Tenn. App. LEXIS 761, at *25 (Tenn. Ct. App. Nov. 9, 1998) (holding that the trial court abused its discretion in failing to award the wife attorney's fees because of the difference in the parties' incomes and because the husband's misconduct was the cause of the divorce and resulting litigation), *rev'd on other grounds by Robertson v. Robertson*, 76

S.W.3d 337, 344 (Tenn. 2002) (reversing the Court of Appeals' decision regarding the type of alimony which was appropriate, but affirming the Court of Appeals' decision in all other respects).

However, fault alone is not sufficient to justify an award of attorney's fees in the absence of a demonstrated need for the alimony. *Wilder*, 66 S.W.3d at 895. In *Wilder*, this court found that the trial court did not address the husband's need for attorney's fees and the wife's ability to pay, but instead focused singularly upon the wife's behavior and fault in the breakup of the marriage. *Id.* This court concluded that "while fault is a factor to be considered, it must not be applied in a punitive manner against a guilty party in determining the award of alimony." *Id.* (citing *Fisher v. Fisher*, 648 S.W.2d 244, 247 (Tenn. 1983); *Gilliam*, 776 S.W.2d at 81)). Similarly, in *Lindsey v. Lindsey*, this court noted that the trial court could properly consider the relative fault of the parties in awarding the wife attorney's fees, but also noted that "a spouse with adequate property and income is not entitled to an award of additional alimony to compensate for attorney's fees and expenses." *Lindsey*, 976 S.W.2d at 181.

In *Gray v. Gray*, No. E2001-02470-COA-R3-CV, 2002 Tenn. App. LEXIS 675 (Tenn. Ct. App. Sept. 19, 2002) (no Tenn. R. App. P. 11 application filed), this court applied the principles of *Wilder* and *Lindsey* to reverse an award of attorney's fees where the trial court did not inquire into the wife's financial need, noting that such an inquiry would have shown that the property awarded her in the divorce was sufficient to allow her to pay such fees. *Id.* at *36. This court declined to review the trial court's finding that the husband was at fault in the divorce, "because even if such findings are valid they constitute an inadequate basis for the award of attorney's fees as such an award is inappropriate absent showing a need on the part of [the wife]." *Id.*

Attorney's fees in a divorce case are not awarded on a "prevailing party" theory. Thus, fault in the breakup of the marriage alone does not justify an award of such fees as spousal support because a spouse with adequate property and income is not entitled to an award of additional alimony for attorney's fees. *Lindsey*, 976 S.W.2d at 181.

We reverse the trial court's award of attorney's fees to Wife because the trial court found that Wife was not economically disadvantaged so as to justify an award of rehabilitative alimony and awarded the fees solely on the basis of Husband's fault, even though there is no evidence that Wife cannot pay the fees. In the absence of proven need on the part of Wife, the award of attorney's fees as alimony is not based upon applicable legal principles.

## IV.  Conclusion

We affirm the trial court's parenting plan and distribution of marital property.  We reverse the trial court's award of attorney's fees to Wife as alimony *in solido*.  Costs are taxed to the appellant, Dawn Larsen Niceley.

_____
PATRICIA J. COTTRELL, JUDGE