IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 18, 2004 Session

## CHRISTOPHER GREY CUMMINGS v. PEPPER LYNNE WERNER CUMMINGS

Appeal from the Chancery Court for Williamson County
No. 28924     Russ Heldman, Chancellor

No. M2003-00086-COA-R3-CV – Filed October 15, 2004

The trial court granted the husband a divorce on the ground of the wife's adultery and made various rulings regarding the parenting arrangement for the parties' one year old son, child support, property division, and award of attorney's fees. The parties have appealed most of the those rulings. Although we affirm the equal sharing of residential placement, we find the six month alternating schedule is not in this child's best interests. We also find other parts of the plan must be vacated in view of recent holdings by the Tennessee Supreme Court. Therefore, we vacate the parenting plan and remand for entry of a new permanent parenting plan addressing the residential schedule, the designation of primary residential parent, allocation of decision-making authority, and child support. In the interim, we reinstate the trial court's *pendente lite* arrangement, as modified, and establish interim support. We affirm the division of property, modify the allocation of debt, and modify the award of attorney's fees.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part, Modified in Part, Vacated in Part, and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Pepper Lynne Werner Cummings.

Robert Todd Jackson, Virginia Lee Story, Nashville, Tennessee, for the appellee, Christopher Grey Cummings.

### OPINION

In this appeal from the trial court's order in their divorce action, the parties have raised a number of issues. The parties were married only fourteen months before the divorce action was initiated. As with many divorce actions, the parties view their experiences from very different

perspectives. The wife tells a story of abandonment, neglect, and loneliness. The husband's is one of betrayal and deceit.

## I. THE MARRIAGE

Christopher Grey Cummings and Pepper Lynn Werner met and began dating in May of 2000. Mr. Cummings, then thirty-five years of age, was unemployed and living in his parents' Brentwood home. His future wife, who taught Interior Design at Watkins Institute, was two years younger and lived on a rented farm in Leiper's Fork. After they had dated for a while, Chris Cummings left his parents' home and moved in with Ms. Cummings, then Ms. Werner.

At some subsequent point, Mr. Cummings bought a trash pick-up service and began to devote himself to operating this new business. He demonstrated energy and ambition in this enterprise, working extremely long hours to get his business off the ground. According to Ms. Cummings' testimony, on some days he worked from 4:00 a.m. to 10:00 p.m., and in some weeks he worked all seven days. Mr. Cummings' other interests included hunting, watching sports, and participating in the activities of his Masonic Lodge. He stayed at a hunting lodge with his long-time friends every weekend during hunting season and two weekends a month during the rest of the year. On Thursdays, he went to meetings at his Masonic Lodge. These activities, combined with his new business, meant Mr. Cummings was rarely home.

In March of 2001, Ms. Cummings discovered that she was pregnant. After Mr. Cummings' initially angry reaction, Ms. Cummings agreed to marry him if he promised to reduce hours away from home and to put an end to his habit of chewing tobacco and leaving his spit cups all over the house. He promised to do both those things. The parties drove to Gatlinburg and got married on Sunday, May 20, 2001. They returned home almost immediately because Mr. Cummings had to work on Monday. Since there was no honeymoon, Mr. Cummings promised that the couple would celebrate their one year anniversary by taking a special trip. That trip never happened.

After the marriage, the parties rented a home in Brentwood near Mr. Cummings' parents. They used the furnishings from Ms. Cummings' home in Leiper's Fork to set up the new household, as Mr. Cummings had none of his own. Ms. Cummings testified that her husband did not change his ways after the marriage, despite his promises to do so. She herself had promised, at Mr. Cummings' insistence, to stop working after the baby was born so she could be a stay-at-home mother.

Ms. Cummings gave birth to the parties' son, Grey Cummings, on November 21, 2001.[1] Even after the birth of their child, Mr. Cummings continued to divide his time between his work and his

[1]According to the testimony of Ms. Cummings, her husband went hunting with his friends two days after Grey was born. Mr. Cummings denied having done so. We note that this was one of the few factual matters about which the parties and their witnesses testified in direct contradiction to each other.

friends, devoting very little time or attention to his wife, the baby, or household tasks. Ms. Cummings, who had few friends of her own, gave up her job in accordance with the parties' agreement, and became a full-time mother and housekeeper. Mr. Cummings continued to chew tobacco regularly.

By March of 2002, the parties were operating on entirely different schedules. Mr. Cummings was going to bed at 1:00 or 2:00 a.m. every night, while his wife had to go to bed at 9:00 or 9:30 so she would be able to get up during the night to feed the baby. Ms. Cummings testified that around this time, her husband stopped communicating with her. Shortly thereafter, in May, Ms. Cummings developed a friendship with Bruce Thompson, the manager of a stable where she boarded her horses. The friendship deepened after Ms. Cummings' mare gave birth to a colt that died the following day. The relationship between Ms. Cummings and Mr. Thompson escalated in June into a sexual affair.

Mr. Cummings found some photos showing his wife, Mr. Thompson, and the baby together, and he began to suspect that his wife was having an affair. He confronted her with his suspicions, but she denied any such relationship. Mr. Cummings did not believe her. He became openly hostile, essentially hounding his wife. When their discussions became confrontational, and Ms. Cummings would attempt to walk away, her husband would follow, pointing his finger at her and screaming that she was a fornicator and an adulterer.

The parties continued (tensely) to share the same home, but Mr. Cummings withdrew financial support from his wife. He stopped making payments on her car and credit cards, and closed their checking account without telling her. Her checks bounced, and unpaid bills accumulated. She went back to work, taking two part-time jobs that generated about $800 per month. She also enrolled in graduate school, with the intention of obtaining a Master's Degree in Business Administration to enhance her earning potential.

Ms. Cummings testified that on the two days a week when she worked the opening shift at the Y.M.C.A., she would leave for work at 4:00 a.m. and return at 8:00 a.m. to find that the baby had not been fed, bathed or clothed. Mr. Cummings testified to the contrary, stating that on those days he properly cared for Grey. Ms. Cummings also testified that when she went to work on Wednesday evenings, her husband did not himself take care of the baby, but took him to his parents' house.

After an initial hearing in the divorce action, the trial court ordered that the parties share residential placement and primary custodial responsibility for Grey on an alternating week basis. The parties continued to live in the same house. On the weeks Mr. Cummings was the parent with residential placement, he would usually take Grey to his parents' house and live there for the week. Similarly, on those weeks Ms. Cummings had residential custody, she and Grey would often spend the week with her parents, who would travel from Missouri and set up residence in their recreational vehicle. A number of problems and difficult situations arose. Mr. Cummings complained that Ms. Cummings would not tell him where Grey was and that she had sometimes left him at day care, contrary to Mr. Cummings' wishes. Ms. Cummings felt that Mr. Cummings still did not spend time with the baby, but just left him with his parents.

## II. COURT PROCEEDINGS

On July 10, 2002, Christopher Cummings filed a Complaint for Divorce on the ground of adultery, stating that "...Wife is carrying on an affair with Bruce A. Thompson II and the relationship is blatantly in front of the parties' minor son." A parenting plan filed with the Complaint proposed that the father be granted primary residential custody of Grey. On July 12, the trial court issued a show cause order, commanding the wife to appear on August 27, and to show cause why the father's parenting plan should not be adopted pending a final hearing. A restraining order enjoining the mother from having her son in the presence of Mr. Thompson was issued on the same day.

On August 7, Ms. Cummings filed an Answer and Counter-Claim for divorce. She denied that she was involved in an improper relationship with Mr. Thompson and asserted that Mr. Cummings neglected his family, spending very little time at home. She also claimed that he withheld financial support from her and "failed to pay the family's necessary and reasonable living expenses in a timely manner." Ms. Cummings asked for a divorce on the grounds of irreconcilable differences and inappropriate marital conduct and for sole custody of Grey, child support, and alimony. She also asked that the separate property she brought to the marital home be returned to her.

During the hearing of August 27, Pepper Cummings denied that she had engaged in a sexual relationship with Bruce Thompson. On September 19, the trial court entered a temporary order giving the parties residential custody of Grey on alternating weeks. Prior to the final hearing, Mr. Cummings took the deposition of Mr. Thompson, during which he admitted the affair with Ms. Cummings. The parties subsequently filed a written stipulation that Mr. Cummings would be granted an absolute divorce on the ground of adultery.

The final divorce hearing began on November 1, 2002, with a second day of testimony on November 13. When she took the stand, Ms. Cummings admitted committing perjury during the hearing of August 27. She apologized to the court, and explained that she had lied to her husband because she was afraid that he would become abusive if he knew of her affair, and that she had lied to the court out of fear that the judge would take her child away from her.

While the accounts of the parties as to the major incidents of their marriage were largely consistent with each other, their perspectives were widely divergent. Chris Cummings testified that he did not understand why his wife had engaged in immoral conduct or why she had never apologized to him or asked for forgiveness. For her part, Pepper Cummings was obviously still angry at her husband for his failure to provide companionship and support after the birth of their baby. She also testified that he paid very little attention to Grey, and routinely turned the child over to his mother when purportedly exercising custody over him.

At the conclusion of the hearing, the trial judge honored the stipulation of the parties and granted Mr. Cummings an absolute divorce on the ground of adultery. The judge also announced that he would take all other matters under advisement. The final determinations of the court are embodied in its Memorandum and Final Order.

The Memorandum invoked the maxims of equity and declared that because of Ms. Cummings' perjury, her "unclean hands," it was necessary to deny her claims for relief. The court accordingly sanctioned Ms. Cummings for her perjury by ordering her to pay attorney's fees and court costs, and by denying her alimony and payment of "certain debts and expenses."

The court declared that it would not punish the child for the misconduct of its mother, but would base its custody and child support decisions on the relevant statutory factors. Finding that, on balance, neither parent demonstrated greater fitness for the assumption of primary custody over Grey than the other, the court ordered that the mother and the father alternate in the role of primary residential parent every six months, with each parent to exercise reasonable visitation during the other parent's period of custody.

The court gave each parent the power to make day-to-day decisions for Grey while the child was residing with that parent. Decision-making authority was also temporally divided between the parents on matters of healthcare, extracurricular activities and religious upbringing with such authority given to the parent with residential placement. The court decreed one exception to this equal division of decision-making authority, however, declaring that the husband could make the decisions regarding Grey's formal education.

Other provisions of the Final Order included child support (husband to pay $1,100 per month when wife has custody, wife to pay $489 per month when husband has custody), housing (husband to remain in marital home and be responsible for payment of rent and utilities, wife to leave), and injunctions (husband to refrain from allowing "spit bottles" of used chewing tobacco and saliva to be left in his home or his car while the child is in his custody, wife to refrain from having overnight guests of the opposite sex other than family members while the child is in her custody). The wife was also enjoined from "locating or residing outside of Williamson County absent the express consent of Plaintiff or the Court." This appeal followed.

### III. THE PARENTING ARRANGEMENT

Both parties agree that the issues surrounding the parenting arrangement of their young child are the most important raised in this appeal. Indeed, decisions as to the custody of a child are among the most important that courts are charged with making. *Lentz v. Lentz,* 717 S.W.2d 876, 877 (Tenn.1986); *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). They are also among the most difficult.

By statute as well as case law, the welfare and best interests of the child are the paramount concern in custody, visitation, and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or her needs. Tenn Code Ann. § 36-6-106(a); Tenn. Code Ann. § 36-6-404; *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999); *Lentz*, 717 S.W.2d at 877. The General Assembly has found that "[t]he best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care." Tenn. Code Ann.

§ 36-6-401(a). The aim of a custodial or residential arrangement is to promote the child's welfare by creating an environment that promotes a nurturing relationship with each parent. Tenn. Code Ann. § 36-6-404(b); *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996).

Trial courts must exercise broad discretion in child custody matters. *Parker*, 986 S.W.2d at 563. "[T]he details of custody and visitation with children are peculiarly within the broad discretion of the trial judge." *Eldridge*, 42 S.W.3d at 85, quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988). Like a custody decision, a determination of the best residential placement plan for a child must turn on the particular facts of each case. Because of the discretion given trial courts in this area and because of the fact specific nature of such decisions, appellate courts are reluctant to second-guess a trial court's determination regarding custody and visitation. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); *Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997) (quoting *Gaskill*, 936 S.W.2d at 631). Accordingly, appellate courts will decline to disturb a parenting plan fashioned by a trial court unless that decision is based on application of an incorrect legal standard, is against logic or reasoning, or is not supported by a preponderance of the evidence. *Eldridge*, 42 S.W.3d at 85; *Nichols v Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997).

In this appeal, Mother argues that the trial court erred in establishing an arrangement whereby each parent had primary custody, or residential placement, of this very young child for six months at a time. She argues that proper application of the facts to the relevant statutory factors, as well as the child's need for continuity and stability, lead to the conclusion that she should be the primary residential custodian of Grey for the entire year, with Mr. Cummings having reasonable visitation.

Mr. Cummings also argues against the alternating six month schedule. However, he argues that he should have been awarded residential placement for the entire year, with Ms. Cummings enjoying reasonable visitation. He argues that the facts properly applied to the applicable statutory factors show he is comparatively more fit than Ms. Cummings.

Before trial, both parents had submitted proposed permanent parenting plans in which each asked to have primary residential placement or primary or sole custody. At trial, Ms. Cummings testified that she was willing to try, for six months or so, the alternating week schedule that the parties had been following pending the final divorce decree. However, she thought additional visitation should be given the nonresidential parent, stating:

> What we do right now is Sunday to Sunday, a week on, a week off. But I believe that's a little bit long. I would like to see maybe perhaps on Wednesday the opposite parent have Grey overnight.

She testified that she thought such an arrangement, providing for additional visitation with the nonresidential parent, would be in the child's best interest because, at the child's young age, a week was too long to go without visitation with the other parent. However, her preference remained that she be given primary custody with reasonable visitation to the father.

When Mr. Cummings was asked what he thought about a six-month sharing arrangement,[2] such as the one ordered by the trial court, he stated, "But six months? I would think that would be too long of a period." When again asked about that proposal by the trial court, the father obviously struggled with the question of which would be better for the child. He concluded that the schedule he proposed, with him having continuous residential placement and the mother having visitation, would be best.

Ms. Cummings expressed her objection to Mr. Cummings's proposal that he have primary residential custody as being her concern that he would not spend time with the child.

> I think every time - - the last two weeks that Chris has had with Grey, when I called to check on him, Chris is always at work. He doesn't make Grey his priority and he doesn't spend time with him. And so, to me, the issue is spending all of his time with Chris's parents. When Chris wants him, he needs to spend time with him. I'm afraid that he won't do that.

Mr. Cummings testified that the reason he should have primary custody was that Ms. Cummings had had an affair and lied to him about it. This caused him to question her decision making and whether he could rely on her to truthfully report to him about Grey.

## A. RESIDENTIAL SCHEDULE

Tennessee Code Annotated § 36-6-404 requires every final custody order to incorporate a permanent parenting plan for any minor children the subject of a divorce, legal separation, annulment or separate maintenance action. A parenting plan is defined in Tenn. Code Ann. § 36-6-402(3) as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule, as well as an award of child support consistent with title 36, chapter 5." According to Tenn. Code Ann. § 36-6-404(a), a permanent parenting plan shall:

> (1) Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for further modifications to the permanent parenting plan;
> (2) Establish the authority and responsibilities of each parent with respect to the child, consistent with the criteria in this part;
> (3) Minimize the child's exposure to harmful parental conflict;
> (4) Provide for a process for dispute resolution, before court action, unless precluded or limited by § 36-6-406; . . .
> (5) Allocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing. The parties

---

[2] At this point, either counsel or the court, or both, interpreted Ms. Cummings's earlier statements as suggesting a residential schedule of alternating six-month intervals. That confusion was cleared up in counsel's next question, "I think I understand what she was saying was that you would have a week, and that she would have a week, like we're doing now, except that on every Wednesday if it was your week, she would have that Wednesday night, and if it were her week, you would have a Wednesday night." That is how we interpret the mother's earlier testimony also.

may incorporate an agreement related to the care and growth of the child in these specified areas, or in other areas, into their plan, consistent with the criteria in this part. Regardless of the allocation of decision making in the parenting plan, the parties may agree that either parent may make emergency decisions affecting the health or safety of the child;

(6) Provide that each parent may make the day-to-day decisions regarding the care of the child while the child is residing with that parent;

(7) Provide that when mutual decision making is designated but cannot be achieved, the parties shall make a good faith effort to resolve the issue through the appropriate dispute resolution process, subject to the exception set forth in subdivision (a)(4)(F);

. . . .

The court is to determine a residential schedule, which designates the primary residential parent and designates in which parent's home the child will reside on given days during the year. A residential schedule is defined as:

. . . the schedule of when the child is in each parent's physical care, and it shall designate the primary residential parent;[3] in addition, the residential schedule shall designate in which parent's home each minor child shall reside on given days of the year, including provisions for holidays, birthdays of family members, vacations, and other special occasions, consistent with the criteria of this part. . . .

Tenn. Code Ann. § 36-6-402(5). When fashioning the residential schedule, the court is instructed to take into account the factors listed in Tenn. Code Ann. § 36-6-404(b):

. . . the court shall make residential provisions for each child, consistent with the child's developmental level and the family's social and economic circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child. The child's residential schedule shall be consistent with this part. If the limitations of § 36-6-406 are not dispositive of the child's residential schedule,[4] the court shall consider the following factors:

---

[3]The primary residential parent is defined as "the parent with whom the child resides more than fifty percent (50%) of the time." Tenn. Code Ann. § 36-4-402(4).

[4]Tenn. Code Ann. § 36-6-406 instructs a court to limit the residential time for a parent that has engaged in certain specified conduct or exhibits certain traits, including, but not limited to: (1) willful abandonment; (2) physical or sexual abuse; (3) emotional abuse; (4) neglect or nonperformance of parental duties; or (5) an emotional or physical impairment which interferes with parental responsibilities. Neither party herein argues that the trial court should have utilized Tenn. Code Ann. § 36-6-406 to limit residential time with either parent.

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society which the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education, and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children.

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

These factors incorporate those set out in Tenn. Code Ann. § 36-6-106, the statute which guided courts in custody determinations prior to the parenting plan legislation. That statute has not been repealed. The primary concern in determinations of a child's residential placement remains the best interests of the child, and consideration of the factors under Tenn. Code Ann. § 36-6-404(b) still necessitates a comparative fitness analysis.

In this case, the trial court considered the relative fitness of the parties for parental responsibilities in light of the factors listed above.[5] The court found that the mother had taken greater responsibility for caring for the child and there were stronger emotional ties between the child and the mother. Tenn. Code Ann. § 36-6-404(b)(2) and (7). On the other hand, the court also found that the father had a stronger willingness than the mother to facilitate and encourage the parent-child relationship between the child and the other parent. Tenn. Code Ann. § 36-6-404(b)(3).

The court concluded that some factors favored the mother and some favored the father, but that neither parent was clearly more fit for primary residential placement. The court's final determination to establish the six month alternating schedule appears to be based on two conclusions. First, because of the child's young age, "Such a short amount of time has passed while the parties have been parents and this gives the Court little confidence that the evidence resoundingly reflects and predicts which parent should be the primary residential parent. . . ." Second, the court concluded that joint parenting obligations and authority would not work and would lead to further litigation. "What is clear is that the parents are abjectly incompatible and are not able to parent jointly."

Just as the trial court reviewed the statutory factors, the parents have each focused on those factors, argued how each of them prevails on specific factors, and asserted that, cumulatively, the weight of the factors favors him or her as the primary residential parent. With regard to those factors, the evidence clearly established that the mother was Grey's primary caregiver and was overwhelmingly responsible for the daily needs of the child up until the trial court established the alternating week custody schedule, which was in place for two months before the final hearing. Tenn. Code Ann. § 36-6-404(2) and (6). In addition, the factor of continuity, Tenn. Code Ann. § 36-6-404(11), would have weighed in favor of placing primary residential care with the mother, had the trial court's *pendente lite* ruling not changed the equation. There is also a basis for the trial court's conclusion that the mother's conduct during the pendency of the case, although not evidencing an attempt to obstruct the father-child relationship, indicated less cooperation with the father as to issues regarding the child. Although at trial Ms. Cummings still had some reservations about Mr. Cummings' parenting skills and time commitment to his child, she testified that she believed he has the potential to be a good parent and expressed a willingness to try a plan that would more closely equalize her custodial time with his.

---

[5]As the trial court in this case correctly observed, decisions as to custody are not to be made for the purpose of rewarding or punishing parents for past behavior. *Turner v. Turner*, 919 S.W.2d 340, 346 (Tenn. Ct. App.1995); *Barnhill v. Barnhill,* 826 S.W.2d 443, 453 (Tenn. Ct. App.1991). Thus, the fault a parent bears for the breakup of the marriage is not relevant for the purposes of a custody determination, except insofar as that parent's conduct bears on his or her fitness for parental responsibilities. *See Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn. Ct. App. 1989). As for any questions of character and its effects on parental fitness that arose from the mother's adultery, and her subsequent failure to testify truthfully about it, the trial court observed that "there is no direct evidence that her immoral behavior has adversely impacted the infant child." The evidence does not preponderate against that finding. While testimony was elicited in an attempt to question Mr. Cummings' character on arguably similar conduct before his marriage, there was absolutely no connection made to any effect on the child.

Based on the record before us, we cannot conclude that the evidence preponderates against the trial court's conclusion that the parents are equally fit. That finding, however, does not necessarily lead to the conclusion that the parenting plan fashioned by the trial court is in this child's best interests. Regardless of the parents' interest in a custody arrangement, the overriding responsibility of the court is to approve or order a parenting plan that promotes the best interest and welfare of the particular child, consistent with the child's developmental level, which promotes a stable relationship with each parent, and that maintains a child's emotional health and stability.

The child who is the subject of this custody dispute was one year old at the time of the trial court's final order herein. Because of this young age, the child's developmental level is a very important consideration in fashioning a parenting arrangement. In its early years, a child's need for stability and continuity is even greater than in an older child. The extremely young child's ability to understand the changes in its environment and separation from a primary caregiver is limited. The phases of early childhood development, the ability to form strong bonds, and the ability to tolerate separation from those with whom the child has bonded are all central to the young child's emotional health and welfare. The arrangement ordered by the trial court, whereby this very young child resides primarily with one parent for six months at a time and then is forced to undergo a sudden and drastic change in that arrangement, does not reflect appropriate emphasis of these factors. Neither parent suggested such an arrangement. When asked about it at trial, both expressed concerns based upon the child's age and the length of time during which one parent has only limited visitation. We cannot conclude that the arrangement ordered by the trial court is in the child's best interest.

That holding, however, presents this court with a difficult dilemma: whether to remand for a new parenting plan or to modify the trial court's plan.[6] After careful consideration, we think the parents should have the opportunity to reach agreement on a new parenting plan based on their experiences and those of the child in the time since the trial court's final order. We understand the trial court's belief that these parties could not cooperate in joint decision-making. However, we are hopeful that the passage of time has lessened the bitterness of the failed marriage and has allowed these parties to grow as parents whose main concern is the welfare of their child. If the parents are able to reach such an agreement, they should seek approval of the trial court. If they are not, they should ask the court to impose a parenting plan after consideration of each parent's proposed plan and the current circumstances.

In the interim, however, we decline to leave the trial court's plan in place as is. Because we have not reversed the trial court's decision that the parents are equally fit, we will not modify the award of equal residential time to each parent. However, we think the child's best interest would be served, at this point, by a reinstatement of the arrangement established in the trial court's *pendente lite* order that the parties were following prior to the court's final order, with the amendment suggested

---

[6]Pursuant to Tenn. R. App. P. 36, this court may grant the parties the relief to which they are entitled and may enter any order or judgment necessary to provide that relief. *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 608 (Tenn. Ct. App. 1999). In their discretion, appellate courts may enter judgments when they reverse a trial court's judgment and may also remand cases when issues are left to be decided. *First Tenn. Bank Nat'l Ass'n v. Hurd Lock & Mfg. Co.*, 816 S.W.2d 38, 40 (Tenn. Ct. App. 1991).

by the mother.  That is, the parties shall have residential custody of the child on an alternating weekly basis, and the parent who does not have the child in a particular week shall be entitled to overnight custody on Wednesday evening, from 6:00 p.m. until 9:00 a.m. Thursday morning.

In sum, we vacate the trial court's parenting plan and reinstate the *pendente lite* arrangement, as modified.  We remand this case to the trial court for a fresh determination of a permanent parenting plan that will further the best interest of the child, in accordance with the current circumstances of the child and of the parties.  As with any permanent parenting plan decision, the parties shall have the opportunity to propose plans and to attempt to agree on a plan.

This remand is also necessitated by our resolution of other issues, and those issues should also be addressed in the development of the new permanent parenting plan.  It does not appear that an actual permanent parenting plan has been filed.  Such a plan should be filed, and the trial court should direct the parties to submit a permanent parenting plan that meets the requirements of Tenn. Code Ann. § 36-6-404, is consistent with this opinion, and reflects any further decisions made by the trial court after remand.  Tenn. Code Ann. § 36-6-404; *Hopkins v. Hopkins*, No. M2002-02233-SC-R11-CV, 2004 WL 2151200 (Tenn. Sept. 27, 2004).  Further, as discussed more fully below, the plan must designate one parent as the primary residential parent, even where residential time is split evenly.  Tenn. Code Ann. § 36-6-402(5); *Hopkins*, 2004 WL 2151200, at *3.

## B.  ALLOCATION OF DECISION-MAKING

As set out earlier, Tenn. Code Ann. § 36-6-404 (a)(5) requires that a permanent parenting plan:

Allocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing.  The parties may incorporate an agreement related to the care and growth of the child in these specified areas, or in other areas, into their plan, consistent with the criteria in this part.  Regardless of the allocation of decision making in the parenting plan, the parties may agree that either parent may make emergency decisions affecting the health or safety of the child;

In the case before us, the trial court's final order included the following provisions in regard to decision-making:

Each parent shall make day-to-day decisions regarding the care of the child while the child is residing with that parent.  Each parent may make emergency decisions affecting the health or safety of the child.  When Plaintiff is the primary residential parent, he shall have decision-making authority regarding the child's education, health care, extracurricular activities and religious upbringing.  When Defendant is the primary residential parent, she shall have decision-making authority regarding the child's education, health care, extracurricular activities and religious upbringing and Plaintiff shall have decision making authority regarding the child's education, the Court finding

-12-

that Plaintiff is financially better disposed to provide the child with education than Defendant. *See* T.C.A. 36-6-404(b)(5).

The trial court's allocation of decision-making authority with regard to education, health care, activities, and religious upbringing divides that authority temporally. This arrangement leads to the possibility that the child could have two pediatricians, two sets of other health care providers, and two different child care, nursery school, or pre-school placements. He may be allowed to participate in a particular sport or activity while in one parent's residential custody, and then have to stop because his residential placement changed. This situation does not promote continuity; nor does it ease the difficulty a young child will experience in making such drastic changes.

The General Assembly has stated its intent regarding the parenting plan legislation. Of particular pertinence here, Tenn. Code Ann. § 36-6-401(a) provides in part:

> Parents have the responsibility to make decisions and perform other parental duties necessary for the care and growth of their minor children. In any proceeding between parents under this chapter, the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities. . . . The general assembly finds the need for stability and consistency in children's lives.

The decision-making allocation ordered by the trial court does not promote consistency and is not in the child's best interests. Our reinstatement of the alternating week schedule for residential placement exacerbates the problems inherent in the trial court's division of decision-making authority. We vacate the trial court's allocation of decision making on issues such as education, extracurricular activities, health care, etc. Unless and until a new permanent parenting plan is agreed to by the parties and approved by the court, or alternatively ordered by the court if no agreement is reached, the parties shall have joint decision-making authority in these areas. If the parties cannot agree, they shall attempt to resolve the issue in accordance with Tenn. Code Ann. § 36-6-404(a)(7). Since the final order in this case, the parties have had time to experience parenting and to recognize the benefits to their child of their cooperation in working toward his best interests. Hopefully, their future actions will reflect this recognition.

Ms. Cummings has also challenged the trial court's award of full decision-making authority regarding the child's education to Mr. Cummings. This part of the order refers to actual school, not pre-school care and activities which are covered by the general statement discussed above. The trial court's statutory reference is to one of the factors in the parenting plan statute which the court is directed to consider when fashioning or approving a residential schedule: "The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care."

The word disposition, with respect to a mental state, means "an attitude, prevailing tendency, or inclination." BLACK'S LAW DICTIONARY (6th ed., 1990). The proof does not show that Ms. Cummings is any less disposed or inclined to furnish her child with a good education than is Mr. Cummings. In her own life, she has shown far more of an inclination towards educational endeavors

than he has. She earned a bachelor's degree in four years, taught for several years at Watkins, and is now pursuing a master's degree. For his part, Mr. Cummings also earned a bachelor's degree, but it took him eleven years to do so. The proof shows that Mr. Cummings is inclined to pay to send his child to a particular school, not that he is any better disposed to provide the child with an education.

The testimony of the parties shows a difference of opinion between the parties as to the best school for Grey to attend when he comes of age. Mr. Cummings wants Grey to go to David Lipscomb, a private school where he himself was educated. Ms. Cummings does not want Grey to go to Lipscomb, but to a public school or to a different private school.

Mr. Cummings expressed a willingness to pay for Grey's tuition at Lipscomb, and is currently in a better financial position than his former wife. These circumstances furnished the factual premise for the trial judge's finding that "Plaintiff is financially better disposed to provide the child with education than Defendant." However, financial ability is not the same as disposition, and decision-making authority does not depend on the relative wealth of the parents.

Ms. Cummings cites the case of *Smith v. Smith,* 220 S.W.2d 227, 629 (Tenn.1949) for the proposition that in matters of custody, including questions of which parent is to exercise decision-making authority over different aspects of the child's life, the paramount consideration must be always the child's best interest, rather than which parent is more financially capable. *Smith* does not specifically involve educational decision-making, but we agree that money should not be the determining factor in allocating parental responsibilities.

The decision of where and how a child should be educated is generally left to the parents, and courts are reluctant to interfere in issues so fundamental to the right to rear a child. However, where parents divorce and are unable to agree on the best school for their child, courts may have to become involved. In essence, that is what the trial court did here: choose a school. When making such a decision, however, courts must avoid engaging in presumptions unsupported by proof in the record. The decision must be made based on the best interests of individual child whose education is at issue.

There is no proof that attendance at any particular school, or even any particular type of school, will serve Grey's best interests to a greater extent that any other school, and it does not seem likely that any such proof can be produced at such an early point in this child's life. While we recognize that it is the goal of the parenting plan legislation to work out as many details as possible in order to avoid future conflicts, in view of the facts of this case, involving a one-year-old child, we cannot agree that the child's best interests are served by the allocation of sole decision-making authority regarding education to the father at this point. Many things can change in these parties' lives before Grey reaches school age. More importantly, Grey himself will have grown and developed; his skills, aptitudes, interests, emotional health, social proclivities, and his needs in an educational environment will be more identifiable. His best interests may then be better determined, hopefully by his parents; if not, by the court.

-14-

We reverse the trial court's award of sole decision-making authority regarding the child's education to the father and direct that the new permanent parenting plan assign that responsibility to the parents jointly, unless the parents submit an agreed parenting plan providing otherwise that is approved by the court. Again, the plan should provide for resolution of any future disagreement over this issue in accordance with Tenn. Code Ann. § 36-6-404(a)(7).

### C. CHILD SUPPORT

In its final order, the trial court established the child support obligations of the parents based upon each parent's tenure as the primary residential parent and each parent's income using the Child Support Guidelines. During the time Ms. Cummings is the primary residential parent, Mr. Cummings is to pay her $1100 per month. During the time Mr. Cummings is the residential parent, Ms. Cummings is to pay him $489 per month.

Both parties challenge the trial court's child support award, essentially asserting that the amount of support was based upon an incorrect determination of the income of each parent. However, a recent decision by the Tennessee Supreme Court, decided after the entry of the trial court's order herein, calls the award into question on other grounds.

In *Hopkins*, 2004 WL 2151200, the Court determined that, even where residential time is divided equally between the parents, the court must designate one of the parents as the primary residential parent. "Tennessee's statutes require both a residential schedule, *see* Tenn. Code Ann. § 36-6-404(b) (2001), and the designation of a primary residential parent, *see* Tenn. Code Ann. § 36-6-402(5)." *Id*. at *3. While affirming the intermediate appellate court's determination that the parents should equally share residential time, the Court vacated the lower court's award of child support because the court had failed to designate a primary residential parent, and the eligibility for child support is based on such a designation.

The Court relied on its previous holding in *Gray v. Gray*, 78 S.W.3d 881, 884 (Tenn. 2002) that child support cannot be awarded to the parent who is not the primary residential parent. The court also rejected the father's arguments that where residential placement is evenly divided, either (1) both parents' incomes should be considered,[7] or (2) neither parent should be obligated to pay support.

---

[7]In *Gray*, the Court also held that it is improper to compare incomes of both parents under the Guidelines. The trial court had considered each parent's income, calculated the amount each would be required to pay for two children under the Guidelines, determined that the father's monthly obligation exceeded the mother's by $737 per month, deviated downward from that amount based on the fact the father was the residential parent for greater than the standard visitation set out in the Guidelines, and set the father's support obligation at $600 per month, although the father was designated as the primary residential parent. 78 S.W.3d at 882. The Supreme Court also held that the authority to deviate from the Guidelines amount does not include the authority to re-align the obligor and obligee. "[T]he income of the obligee should not be considered in the calculation of or as a reason for deviation from the guidelines in determining the support award amount." *Gray*, 78 S.W.3d at 884, quoting Tenn. Comp. R. & Regs. 1240-2-4-.03(2).

In the case before us, the trial court made an alternating designation of each parent as the primary residential parent for six months at a time. While that designation accurately reflected the actual situation arising from the court's residential schedule, we conclude that the Supreme Court's holdings and analysis in *Gray* and *Hopkins* preclude the designation of both parents as the primary residential parent, even on an alternating basis. As the Court pointed out, the designation has consequences with regard to other state and federal statutes that require designation of one parent as the primary custodian. *Hopkins*, 2004 WL 2151200, at \*3 n.3; *see also* Tenn. Code Ann. § 36-6-410. We think the Supreme Court has interpreted the Child Support Guidelines and the parenting plan legislation as requiring the designation of only one parent as the primary residential parent and as prohibiting the designation of both parents as such.

Consequently, we must vacate the trial court's alternating designation of both parents as the primary residential parent and the court's award of child support based on that rotating status.[8] On remand, the trial court should designate either Ms. Cummings or Mr. Cummings as the primary residential parent and calculate the amount of support, if any, due to the primary residential parent.

"Primary residential parent defined as "the parent with whom the child resides more than fifty percent (50%) of the time." Tenn. Code Ann. § 36-4-402(4). In an arrangement where each parent has an exactly equal amount of residential placement time, neither parent actually meets this definition.[9] However, even though there may be no primary residential parent in fact, the law requires the designation of one parent as the primary residential parent, regardless of the statutory definition.

The Supreme Court did not provide guidance in *Hopkins* on the factors to be considered in designating one parent as the primary residential parent where neither parent has residential custody of the child more than 50% of the time. By the time a trial court has reached the conclusion that equally shared residential time is in the child's best interests, it will have already considered all the statutory criteria relevant to primary residential custody, such as continuity, parent-child attachment, ability and willingness to provide for the child's needs, etc. After considering those factors, the court will have concluded that the parents should share residential time equally, *i.e.*, that neither parent should have residential placement for more than 50% of the time. Consequently, when the court must by law designate a primary residential parent after having determined that neither parent should, in fact, be the primary residential parent, the statutory factors have little relevance. Otherwise, we would be requiring the court to re-evaluate the same factors.

However, the designation of primary residential parent has a practical and immediate effect of the child's right to support and, therefore, on the child's best interests. Therefore, when designating a primary residential parent in a situation where all the other relevant factors lead to equally shared residential time, we think the trial court should consider the fact that only the primary residential parent

---

[8]Again we point out at the time of its final order, the court did not have the benefit of the Supreme Court's holding and analysis in *Hopkins*.

[9]As the Court noted in *Hopkins*, the guidelines consider the actual physical custody, regardless of the label assigned to the custody arrangement.

is entitled to receive support. "Child support payments are for the benefit of the child, and both parents have a duty to support their minor children." *Hopkins*, 2004 WL 2151200, at *2, citing *Gallaher v. Gallaher*, 104 S.W.3d 455, 461 (Tenn. 2003). One of the major goals of the Child Support Guidelines is:

> To ensure that when parents live separately, the economic impact on the child(ren) is minimized and to the extent that either parent enjoys a higher standard of living, the child(ren) share(s) in that higher standard.

Tenn. Comp. R. & Regs. 1240-2-4-.02 (2)(e).

Consequently, when one parent's income is greater than the other's, the child should not be disadvantaged by a determination that deprives the child of support that would help him or her share in that parent's economic advantage. All other factors being equal, we think this consideration militates in favor of designating the parent with lower income, when the difference is enough to affect the child's standard of living, as the primary residential parent when residential time is shared equally. Of course, the other parent's support obligation may be reduced because of the greater than standard time he or she has residential custody of the child, and the courts should make a case-by-case determination of the amount of support due. *Hopkins*, 2004 WL 2151200, at *3; *Gray*, 78 S.W.3d at 884; Tenn. Comp. R. & Regs. 1240-2-4-.04(2)(b).

Because it is important that the child herein not be deprived of the benefit of support during the time it may take for a new parenting plan to the developed, approved, or ordered, and based upon the trial court's rulings on child support, during the interim until a new plan is in effect Ms. Cummings shall be designated as the primary residential parent. Based upon the trial court's calculations of Mr. Cummings' support obligation under the Guidelines, and deviating downward from that amount due to the extended time Grey will be in Mr. Cummings' physical custody, Mr. Cummings shall pay to Ms. Cummings child support in the amount of $500 per month until a new parenting plan setting support is entered.

## IV. THE INJUNCTION

The trial court's final order includes an injunction to prevent Ms. Cummings from residing outside Williamson County "absent the express consent of Plaintiff [Mr. Cummings] or the Court."[10] We can find no basis in law for the trial court's injunction preventing an adult citizen from living where she may choose.

To the extent the court based the injunction on some concern about the mother relocating with the child, that situation is governed by statute. Tenn. Code Ann. § 36-6-108. *See Caudill v. Foley,* 21 S.W.3d 203, 206 (Tenn. Ct. App. 2000); *Helton v. Helton*, No. M2002-02792-COA-R3-CV, 2004 WL 63478 (Tenn. Ct. App. January 13, 2004) (no Tenn. R. App. P. 11 application filed). The statute

---

[10]We note that the father's Prayer for Relief did not contain a request for any such injunction.

-17-

is not designed to give the courts the authority to dictate where divorced parents must live, but only to protect the visitation rights of non-custodial parents in situations where the custodial parent wishes to relocate to another state or more than 100 miles from the residence of the non-custodial parent.

There is no proposed relocation in the case before us and no notice that would trigger the court's involvement in that decision. Even in those situations involving a proposed relocation to another state, the statute does not bar relocation, but merely sets out a procedure that the custodial parent must follow in order to obtain the court's permission to move with the child.

We accordingly vacate the injunction because it is beyond the court's authority.

## V. PROPERTY ISSUES

Ms. Cummings challenges the trial court's distribution of the parties' property on two grounds. First, she argues that the court awarded property that was her separate property to Mr. Cummings. Second, she argues that the trial court's award of marital property was inequitable and that the allocation of marital debt was inequitable.

Ms. Cummings is correct, of course, in asserting that separate property is not subject to division or distribution. Tenn. Code Ann. § 36-4-121(a)(1); *Brock v. Brock*, 941 S.W.2d 896, 900 (Tenn. Ct. App. 1996); *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995). The general rules for determining whether property is separate or marital are found in statute. Tenn. Code Ann. §§ 36-4-121(b)(1) & -121(b)(2). Property owned by a party before marriage is generally classified as separate property and remains with the original owner. Tenn. Code Ann. § 36-4-121(b).

On appeal, Ms. Cummings asserts that the proof showed that prior to the marriage she owned household furnishings, while Mr. Cummings owned none.[11] She particularly disputes the award to Mr. Cummings of half the dishes, silverware and cookware. On appeal, Mr. Cummings does not dispute the ownership of these items and volunteered to return the dishes, silverware, and cookware that Ms. Cummings owned prior to the marriage. We agree that they should be restored to her.

In addition, Ms. Cummings asserts the she owned pieces of baby furniture that are family heirlooms and that the parties were using for Grey. Consequently, she objects to the trial court's order that:

> All of the minor child's furnishings, toys and clothing currently at the marital residence shall remain there as the property of the child. Only that which Plaintiff agrees may go with Defendant shall go with Defendant.

---

[11] One problem that the trial court encountered in dividing the property in this case was that the wife's proposed division of household furniture and furnishings submitted to the trial court did not make a distinction between marital property and her separate property.

The proof shows that furnishings used for Grey include an antique crib and changing table that belonged to Ms. Cummings' family before the marriage. Mr. Cummings stipulated on appeal that he had no objection to the mother regaining possession of above items after Grey no longer had need of them. However, since these are the wife's separate property, not the child's, they should have been awarded to her as her separate property, and she is entitled to regain possession of these items immediately if she wishes.

Ms. Cummings' second argument regarding property is that the division of marital property was inequitable. She has provided a table reflecting the trial court's award of various pieces of property and the valuation given those pieces by the parties. She first argues that the apparent division is misleading because the court included two pieces of property that neither party owned. The first is a 1967 Camaro which Ms. Cummings testified, without contradiction, belonged to her parents. The second is an investment account that she stated was not hers but was an asset of her deceased father's estate. When the total value assigned to those two items by Ms. Cummings is deducted, Ms. Cummings values the property awarded to her at $19,250 and that awarded to Mr. Cummings at $17,350.

The trial court is charged with equitably dividing, distributing, or assigning the marital property in "proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1); *Jolly v. Jolly*, 130 S.W.3d 783, 785 (Tenn. 2004). The court is to consider all relevant factors in its distribution. Tenn. Code Ann. § 36-4-121(c) (listing the factors to be considered). The court may consider any other factors necessary in determining the equities between the parties, Tenn. Code Ann. § 36-4-121(c)(11), except that division of marital property is to be made without regard to marital fault. Tenn. Code Ann. § 36-4-121(a)(1).

The court's distribution of property "is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case." *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). An equitable distribution is not necessarily an equal one, and a division is not rendered inequitable simply because it is not precisely equal. *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998); *Word v. Word*, 937 S.W.2d 931, 933 (Tenn. Ct. App. 1996).

Because dividing a marital estate is a process guided by considering all relevant factors, in light of the facts of a particular case, a trial court has a great deal of discretion concerning the manner in which it divides marital property. *Jolly*, 130 S.W.3d at 785; *Flannery v. Flannery*, 121 S.W.3d 647, 650 (Tenn. 2003); *Smith v. Smith*, 984 S.W.2d 606, 609 (Tenn. Ct. App. 1997). Appellate courts ordinarily defer to the trial court's decision unless it is inconsistent with the factors in Tenn. Code Ann. §36-4-121(c) or is not supported by a preponderance of the evidence. *Jolly*, 130 S.W.3d at 785-86.

Based on our review of the record, we cannot conclude that the evidence preponderates against the trial court's division or that the division is inconsistent with the relevant factors. We affirm the court's division of marital property as equitable.

Ms. Cummings also challenges the trial court's allocation of marital debt as inequitable in light of the relevant factors: (1) which party incurred the debt, (2) the purpose of the debt, (3) which party benefitted from incurring the debt, and (4) which party is better able to repay the debt. *Alford v. Alford*, 120 S.W.3d 810, 814 (Tenn. 2003); *King v. King*, 986 S.W.2d 216, 218 (Tenn. Ct. App. 1998); *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989). She argues that most of the debt incurred during the marriage was for the benefit of the family, that both parties therefore benefitted from it, and that Mr. Cummings is better able to pay the debts.

All debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing are marital debts. *Alford*, 120 S.W.3d at 813. Like marital property, marital debt is subject to equitable distribution. *Id.* Application of the four factors listed above insures a fair allocation and protection of one spouse from the personal excesses of the other. *Id.* at 814.

The trial court ordered Mr. Cummings to pay the Sears debt and one-half the Bank of America debt, for a total of $6,054. It ordered Ms. Cummings to pay four credit card debts and the other half of the Bank of America debt, for a total of $15,343. Ms. Cummings had the credit cards before the marriage and owed balances on them at that time of approximately $4,563.[12] Subtracting those balances, Ms. Cummings was ordered to pay $10,780 of the debt incurred during the marriage. Thus, out of the total debt incurred during the marriage, $16,834, the husband was ordered to pay 36% and the wife was assigned 64%.

Ms. Cummings does not object to being assigned the debt she had accumulated before the marriage. Instead, she argues that although the credit cards were in her name, the charges made during the marriage were for the family. The evidence supports that argument. She also argues that her income is much smaller than her former husband's, and the evidence also supports that position. At the time of the parties met, Ms. Cummings was working and Mr. Cummings was not. At her husband's request, Ms. Cummings gave up her employment after the birth of their child. When the marriage began deteriorating, she began working part time. Meanwhile, Mr. Cummings had started a business and worked industriously to make it successful.

We agree that the debt incurred during the marriage should be more equitably divided. However, we do not agree that Mr. Cummings should be assigned all but one account, as suggested by Ms. Cummings. We think an equal division would be equitable under the facts of this case. Therefore, we modify the trial court's allocation of marital debt. Mr. Cummings shall be responsible for the $4,754 debt to Sears and $1,300 of the Bank of America debt, as ordered by the trial court.

---

[12]For all our calculations, we have used the individual figures from the wife's table, but have arrived at totals different from those used by Ms. Cummings in her brief.

In addition, he shall pay to Ms. Cummings $2,062 to equalize the debt incurred during the marriage.[13]

## VI. ATTORNEY'S FEES

The trial court ordered Ms. Cummings to pay her former husband $11,000 for attorney's fees, expenses, and costs as a sanction for her perjury in the first hearing.

Generally, an award of attorney's fees in divorce cases is considered alimony or spousal support, generally characterized as alimony *in solido*. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001); *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001). Courts are authorized to award "suitable support and maintenance of either spouse by the other spouse . . . according to the nature of the case and the circumstances of the parties. . . ." Tenn. Code Ann § 36-5-101(a)(1).

Because attorney's fees are considered alimony or spousal support, an award of such fees is subject to the same factors that must be considered in the award of any other type of alimony. *Yount*, 91 S.W.3d at 783; *Lindsey v. Lindsey*, 976 S.W.2d 175, 181 (Tenn. Ct. App. 1997). Therefore, all relevant factors, including those listed in Tenn. Code Ann. § 36-5-101(d)(1), are to be considered and balanced in a determination of whether to award attorney's fees. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 751 (Tenn. 2000); *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). *See also Robertson v. Robertson*, 76 S.W.3d 337, 338 (Tenn. 2002); *Anderton v. Anderton*, 988 S.W.2d 675, 682-83 (Tenn. Ct. App. 1998).

Among the factors relevant to an award of alimony, the two considered to be the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson*, 76 S.W.3d at 342; *Bogan v. Bogan*, 60 S.W.3d 721, 730 (Tenn. 2001); *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995). As with other forms of spousal support, the need of the spouse requesting the award of attorney's fees is the single most important factor; the most important factors are the real need of the disadvantaged spouse, a demonstrated financial inability to obtain counsel, and the ability of the obligor spouse to pay. *Miller*, 81 S.W.3d at 775; *Wilder*, 66 S.W.3d at 895; *Watters*, 22 S.W.3d at 821; *Cranford*, 772 S.W.2d at 50. Consequently, a spouse with adequate property and income is generally not entitled to an award of additional alimony to compensate for attorney's fees and expenses, depending on all relevant factors. *Wilder*, 66 S.W.3d at 895; *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000); *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997); *Houghland v. Houghland*, 844 S.W.2d 619, 623-24 (Tenn. Ct. App. 1992); *Lindsey*, 976 S.W.2d at 181. The primary focus is on whether the requesting spouse has the ability to pay his or her own fees; and, if not, whether the other spouse has the resources to do so.

---

[13]This figure was arrived at by calculating the total indebtedness ($21,397), subtracting the premarital balances ($4,563), subtracting the balance on one account that the wife does not request that the husband assume ($602), dividing the net joint debt in half ($8,116 each), and subtracting from the husband's half the amounts he was previously ordered to pay.

Trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount and duration. *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001). An award of attorney's fees as alimony, like an award of other support, is considered to be within the sound discretion of the trial court. *Loyd v. Loyd*, 860 S.W.2d 409, 413 (Tenn. Ct. App. 1993); *Wallace v. Wallace*, 733 S.W.2d 102, 110-11 (Tenn. Ct. App. 1987). Consequently, such an award will not be reversed on appeal if that discretion is not abused. *Aaron*, 909 S.W.2d at 411 (citing S*torey*, 835 S.W.2d at 597); *Yount*, 91 S.W.3d at 783; *Elliot v. Elliot,* 825 S.W.2d 87, 92 (Tenn. Ct. App. 1991). A trial court abuses its discretion only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining. *Eldridge*, 42 S.W.3d at 85.

While fault is one of many factors that may be considered in setting spousal support, Tenn. Code Ann. § 36-5-101(d)(1)(k), our courts have generally disapproved of the use of alimony as a weapon to punish a guilty spouse. *Anderton*, 988 S.W.2d at 682; *Duncan v. Duncan,* 686 S.W.2d 568 (Tenn. Ct. App. 1984). "It is well settled that while fault is a factor to be considered, it must not be applied in a punitive manner against a guilty party in determining the award of alimony." *Wilder*, 66 S.W.3d at 895. Since marital fault may be considered in an award of alimony, it may also be considered in an award of attorney's fees as alimony. *Inman v. Inman*, 811 S.W.2d 870, 874 (Tenn. 1991); *Yount*, 91 S.W.3d at 783. However, marital fault alone is not sufficient to justify an award of attorney's fees in the absence of a demonstrated need for the alimony. *Wilder*, 66 S.W.3d at 895, citing *Fisher v. Fisher*, 648 S.W.2d 244, 247 (Tenn. 1983) ("while fault is a factor to be considered, it must not be applied in a punitive manner against a guilty party in determining the award of alimony"). While a trial court could properly consider the relative fault of the parties for the breakup of the marriage in awarding fees, "a spouse with adequate property and income is not entitled to an award of additional alimony to compensate for attorney's fees and expenses." *Lindsey*, 976 S.W.2d at 181. Attorney's fees in a divorce case are not awarded on a "prevailing party" theory. The marital fault of a party alone, without consideration of the financial need and ability to pay of the parties, is not a sufficient basis for the award of attorney's fees.

In the case before us, Mr. Cummings did not demonstrate a financial need for the award of spousal support or attorney's fees. The financial situations of the parties at the end of the marriage made Ms. Cummings the economically disadvantaged spouse. The trial court herein did not base its award of attorney's fees on the factors of need or ability to pay; nor did it award fees to Mr. Cummings on the basis of any finding of marital fault on the part of Ms. Cummings. Instead, the court ordered Ms. Cummings to pay her former husband's legal fees as a sanction for her conduct in this litigation.

Perjury is an offense against the courts that should be neither condoned nor taken lightly. It "offends the basic principles underlying our judicial system." *Wilder v. Wilder*, 863 S.W.2d 707, 713 (Tenn. Ct. App. 1992). Perjury is the type of conduct that may justify a denial of relief in a divorce case under the doctrine of unclean hands. *Chastain v. Chastain*, 559 S.W.2d 933, 935 (Tenn. 1977). It does not, however, require such denial, and the facts and circumstances of each situation must be examined. *Wilder*, 863 S.W.2d at 713. The trial court's award of the husband's attorney's fees herein is not a denial of relief to the wife. Rather, as the court stated, it is punishment

for her false testimony. An award of fees against a party who has committed perjury during the litigation is an allowable punishment. *Wilson v. Wilson*, 58 S.W.3d 718, 729 (Tenn. Ct. App. 2001). In addition, courts also retain authority to punish or sanction perjury by other means and remedies.[14]

Where the sanction imposed inures to the financial benefit of the other party, we believe all the circumstances must be considered and the sanction should have some relation to the harm caused the other party by the perjury. In the case before us, it was Ms. Cummings' sworn denials of adultery that constituted her false testimony. Only after her partner in that adultery testified in contradiction to those denials did she admit the true facts and agree to stipulate to Mr. Cummings being awarded the divorce on the ground of adultery. Mr. Cummings was forced to incur costs and expenses in efforts to disprove his wife's false denials that he would not have incurred if she had been truthful in this litigation from the outset. Some of those costs relate to the retention of a private investigator and the preparation of a laboratory report, obtaining telephone records, and taking the deposition of Mr. Thompson, including attorney time, reporter fees and transcription costs. Requiring Ms. Cummings to pay these additional costs caused by her false testimony is reasonable, related to curing the harm caused the other party, and well within the court's discretion.

However, these expenses do not constitute all the attorney's fees incurred by Mr. Cummings in this litigation. As this opinion demonstrates, the parties litigated a number of issues related to the dissolution of their marriage. These issue would have required attorney time in preparation and trial regardless of Ms. Cummings' initial denials, just as they did after her stipulation, acknowledgement of wrongdoing, and apology to the court. As to those fees, the general principles applicable to attorney's fee awards in divorce cases should be the factors guiding the decision. As stated earlier, Mr. Cummings has not demonstrated his inability to pay his own attorney's fees and his need to have those fees paid by his former wife. Similarly, the wife's ability to pay them, as well as her own fees, is less than the husband's.

Accordingly, we affirm that portion of the trial court's award of attorney's fees to Mr. Cummings for those fees and expenses related to or caused by Ms. Cummings' denial, in this litigation, of adultery. This court is unable to accurately identify those charges and expenses from the records submitted to the trial court. Consequently, we must remand for calculation of the appropriate amount. Except for those fees in the amount determined, each party shall be required to pay his or her own attorney's fees.

## VII. CONCLUSION

We vacate the permanent parenting plan ordered by the trial court and remand for adoption of a new permanent parenting plan addressing the residential schedule, designation of primary residential parent, establishment of child support, and allocation of decision-making authority. Pending approval or order of a new plan: (1) the parties shall each have primary residential custody

---

[14]For example, Ms. Cunningham could face criminal prosecution or contempt proceedings. False testimony can also affect the trial court's assessment of credibility as to other testimony. The trial court herein made no adverse credibility findings with regard to the wife's other testimony, much of which was uncontested in any event.

of their child on a weekly basis with midweek overnight visitation for the nonresidential parent; (2) the father shall pay child support of $500 per month; (3) the parties shall have joint decision-making authority regarding education, healthcare, activities, and religious upbringing. The injunction against the mother leaving the county is vacated. The distribution of marital property is affirmed, and the allocation of marital debt is modified as specified. The award of attorney's fees is modified to only that amount related to disproving the wife's false testimony, which amount should be calculated by the trial court on remand. We remand this case to the Chancery Court of Williamson County for further proceedings consistent with this opinion. The costs on appeal are taxed equally to the Appellant, Pepper Cummings, and the Appellee, Christopher Cummings.

_____
PATRICIA J. COTTRELL, JUDGE